**Jack H. BLAIR, Plaintiff–Appellant**

v.

**Sarah CAMPBELL, Defendant–Appellee.**

Supreme Court of Tennessee,
at Jackson.

May 20, 1996.

R. Sadler Bailey, Law Offices of Bailey & Associates, Memphis, for Plaintiff-Appellant.

William W. Dunlap, Jr., Harris, Shelton, Dunlap & Cobb, Memphis, for Defendant–Appellee.

## OPINION

DROWOTA, Justice.

In this premises liability case the plaintiff, Jack H. Blair, appeals from the Court of Appeals' affirmance of the summary judgment granted in favor of the defendant, Sarah Campbell. The issue for our determination is whether the defendant, the owner of the premises, owed to the plaintiff, an independent contractor hired by the defendant to repair a leaking roof, a duty to provide a reasonably safe place to work under the facts of this case. Although a premises owner generally owes a contractor the duty to provide a reasonably safe workplace, we conclude that this duty does not apply when the

contractor is injured while making the specific repairs called for in the contract. Since it is undisputed that the plaintiff was so injured in this case, we affirm the judgment of the Court of Appeals and the trial court.

### FACTS AND PROCEDURAL HISTORY

In 1990 Sarah Campbell, the defendant, acquired a duplex located in Union City, Tennessee. Because Campbell lives in a retirement home in Memphis, she arranged to have Jane Thomas, a Union City realtor, manage the property for her.

When Campbell acquired the property, it was generally in a state of disrepair. Since she wished to get the duplex ready to be rented or sold, Campbell asked Thomas to hire someone to perform the necessary repair work. In June 1991 Thomas spoke with Jack Blair, the plaintiff, about doing the work. At that time Blair agreed to paint the exterior of the duplex and to replace some window sills. Blair subsequently completed this work and was paid $1,500.

Shortly thereafter Campbell traveled from Memphis to Union City to inspect the property. After the inspection she asked Blair to perform additional work, including painting the interior of the duplex and replacing some rotten wooden siding on the structure. Campbell also specifically requested that Blair repair or replace the roof over the porch of the duplex because "it was leaking." Blair agreed to perform the additional work at the rate of $10 per hour for himself and $6 per hour for his employees. Blair was given full control as to how the requested repairs were to be accomplished.

On August 3, 1991, Kenny Dyer, one of Blair's employees, propped a ladder against the gutter running alongside the porch roof and ascended for the purpose of tearing the shingles off the roof. After Dyer had removed some or all of the shingles, he asked Blair to come up on the roof and tell him what to do next. Blair climbed the ladder and stepped onto the roof, but told Dyer that they should talk about the matter on the ground because of the extreme heat. As Blair stepped out onto the ladder, the wood supporting the gutter collapsed, causing the ladder to turn. Blair was thrown to the ground; and he sustained serious personal injuries in the fall. It is undisputed that the wood supporting the gutter was rotten, and that this condition caused Blair to fall.

In August 1992 Blair brought a negligence action against Campbell, alleging that she had failed to provide him with a reasonably safe place to work. After denying all allegations of negligence, Campbell moved for summary judgment, which was granted by the trial court. Blair appealed from this ruling to the Court of Appeals, which determined that Campbell had no duty to provide Blair with a safe place to work under the circumstances of the case; therefore, that court affirmed the judgment. We granted Blair's application for permission to appeal in order to address this issue in light of *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992) and its progeny.

### ANALYSIS

It is well-settled that an owner generally owes an independent contractor hired to perform work on the premises a duty to provide a reasonably safe place in which to work. *Hutchison v. Teeter*, 687 S.W.2d 286, 288 (Tenn.1985); *Broome v. Parkview*, 359 S.W.2d 566, 568 (Tenn.App.1962). This general duty includes the specific responsibility of either removing, or warning the independent contractor of, any hidden or latent dangers on the property. *Eaton v. McLain*, 891 S.W.2d 587, 595 (Tenn.1994); *Odum v. Haynes*, 494 S.W.2d 795, 800 (Tenn.App. 1972); *Jackson v. Tennessee Valley Authority*, 413 F.Supp. 1050, 1056 (M.D.Tenn.1976).

An important exception to this general rule has, however, long been recognized in Tennessee law. In *Shell Oil Co. v. Blanks*, 46 Tenn.App. 539, 330 S.W.2d 569 (1959), a case in which a contractor hired to paint a steel lightpole on gas station premises brought suit after the pole collapsed and caused his ladder to fall, the Court of Appeals explained that:

> An exception to the general rule is recognized where the risks arise from, or are intimately connected with, defects of the premises or of machinery or appliances located thereon which the contractor has

undertaken to repair. As to contracts for such repair work, it is reasoned that the contract is sufficient in itself to impart notice of a defect, the extent of which the repairman must discover for himself. This is merely to say that one assumes the risk of a known danger or of an undertaking which is inherently dangerous.

*Blanks,* 330 S.W.2d at 571. [1]

In applying the rules to the case before it, the *Blanks* court first noted that the pole was defective in that the "bolt and tap" used to hinge the pole in the middle [2] had, after becoming inoperable, been replaced by the owner with a coil of wire, which had then been painted the same color as the rest of the pole. Thus, the Court concluded, the pole contained a latent defect that was ·not reasonably discoverable by the contractor; and this defect had caused the pole to collapse. The Court then concluded that the aforementioned exception to the general duty to provide a reasonably safe workplace did not apply because "*[the] contract was not to repair the pole but to paint it. There was, therefore, nothing in the contract to imply the existence of a defect or a danger to be avoided.*" *Blanks,* 330 S.W.2d at 572 (emphasis added). Because it determined that the general rule was applicable, and because the premises owner failed to discharge its duty to warn, the Court affirmed a jury verdict in favor of the plaintiff.

■ The application of *Blanks* to the case before us yields a clear result. It is undisputed that Blair was specifically asked by Campbell to repair the porch roof because it was leaking. Although Blair was not told of the extent of the damage to the roof, and perhaps could not have known until he climbed the ladder, this is immaterial under *Blanks:* the repair contract itself is sufficient to put the contractor on notice of a defect in the premises, and it is the contractor's responsibility to determine the extent of the defect. The case before us obviously falls within the exception enunciated in *Blanks;* therefore, pursuant to that case the owner here was under no duty to provide a reasonably safe workplace to the contractor.

Although conceding that *Blanks* has not been expressly overruled, Blair nevertheless asserts that it should not control this case. He first argues that the exception recognized in *Blanks* is actually a "primary implied assumption of the risk" defense, and that because we abolished that defense in *Perez v. McConkey,* 872 S.W.2d 897 (Tenn.1994), this case must be determined "under straight comparative fault principles enunciated in *McIntyre* ..." Therefore, Blair argues, the duty question should have been presented to the jury for its determination.

We cannot accept this argument. While it is true that we did abolish "primary implied assumption of the risk" as a distinct defense in *Perez,* we also recognized that the defense is simply another expression of the common law concept of duty. We stated:

In its primary sense, implied assumption of risk focuses not on the plaintiff's conduct in assuming the risk, but on the defendant's general duty of care. The doctrine of primary implied assumption of risk 'technically is not a defense, but rather a legal theory which relieves a defendant of the duty which he might otherwise owe to the plaintiff with respect to particular risks.' Clearly, primary implied assumption of risk is but another way of stating the conclusion that a plaintiff has failed to establish a prima facie case by failing to establish that a duty exists.

*Perez,* 872 S.W.2d at 902 (citations omitted).

In deciding not to retain the terminology of the defense, we reasoned:

1. In deriving this rule, the *Blanks* court primarily relied upon Annotation, *Duty of Owner of Premises to Furnish Independent Contractor or His Employee a Safe Place of Work, Where Contract is for Repairs,* 31 A.L.R.2d 1375 (1953). When the annotation was published, an overwhelming number of jurisdictions adhered to this rule in some form. *See* cases collected at § 2. A review of the "Later Case Service" to the annotation, published in 1995, reveals that this is still the law in most jurisdictions. Moreover, the annotation reveals several cases dealing specifically with roofers in which the rule, or some analogous form thereof, was applied to deny recovery as matter of law. *See e.g., Grant v. Eastern Airlines, Inc.,* 556 So.2d 1135 (Fla.App.1989); *Beckford v. Canessa,* 205 A.D.2d 655, 613 N.Y.S.2d 659 (1994); *Muscat v. Khalil,* 150 Mich.App. 114, 388 N.W.2d 267 (1986).

2. The pole was hinged in the middle so that it could be lowered to change the light bulbs.

Because duty is an element of the plaintiff's prima facie case, the doctrine of primary implied assumption of risk, as an alternate expression of the concept of duty, would serve no productive purpose; indeed it would only confuse and convolute the issues ... *While we agree that those situations described by commentators as involving the concept of primary implied assumption of the risk will preclude recovery under a scheme of comparative fault, the same result will be obtained, without any unnecessary confusion, if Tennessee courts use the common-law concept of duty to analyze the issues.*

*Id.* at 905 (emphasis added).

■ It is obvious that our adoption of the principles of comparative fault did not alter the analysis applicable to the common-law concept of duty, *see e.g., Eaton v. McLain,* 891 S.W.2d 587, 593–97 (Tenn.1994); and it is beyond dispute that duty is a question of law for the trial court's determination. *Carson v. Headrick,* 900 S.W.2d 685, 690 (Tenn.1995). Therefore, this argument is without merit.

Blair alternatively argues that the *Blanks* rule is flawed as a matter of public policy. He contends that:

[I]f there is no duty arising from the very repairs the contractor is engaged to make, there is a disincentive for contractors to accept repair jobs where there might be any doubt as to the safety of the work site. Contractors will be in the position of having to weigh pure economic need against perceived threats to their safety. In other words, a contractor will have to decide whether a given job is worth the physical risk of harm that might be presented by accepting the job. Landowners will have an incentive to repair property for the sake of third parties, but at the same time they will be in the position of giving repair workers no guarantee of safety ... Such an absence of duty should be void as against public policy ...

This argument, however eloquently made, fails because it describes a market situation already endorsed by public policy. In other words, the law of this state, and of all others that we are aware, perceives danger as a legitimate consideration in the bargaining process, as long as the contractor has a reasonably specific idea of the perils that he or she will encounter. For example, it is common knowledge that construction workers on skyscrapers and other very tall structures earn more than their co-workers in less dangerous positions. Simply put, danger is often treated as one of the many factors in the pricing of an economic transaction.

■ Furthermore, the policy of placing the risk of incurring physical harm during a repair job on a contractor holding himself or herself out as an expert in that work, as opposed to the lay premises owner, is not unjustified, at least as long as the owner does not willfully or intentionally harm the contractor.[3] To hold otherwise would be to require the untutored owner to inspect the roof for defects before calling a roofing contractor; it would also require the owner to inspect the electrical box before employing an electrician. We do not believe sound public policy requires such a anomalous result; therefore, the plaintiff's argument on that ground is without merit.

For the foregoing reasons, the judgment of the Court of Appeals and the trial court is affirmed.

ANDERSON, C.J., and REID, BIRCH and WHITE, JJ., concur.

---

**3.** Indeed, the Restatement (Second) of Torts, § 412, Comment c provides: "in the present era of specialization, it may be proper for a lay employer to trust implicitly in the technical competence of a contractor who makes a business of making or repairing many of the instrumentalities which have become a part of everyday life."