IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2005 Session

# GARY EDWIN BENNETT, ET AL. v. TREVECCA NAZARENE UNIVERSITY

**Appeal from the Circuit Court for Davidson County**
**No. 02C-3649      Walter Kurtz, Judge**

**No. M2004-01287-COA-R3-CV - Filed October 7, 2005**

Plaintiffs, certified low voltage electricians, filed a personal injury action against university for negligently informing them that university's switchgear cabinet was low voltage, when in fact, it was high voltage, for failing to provide a conspicuous high voltage warning sign on the high voltage switchgear and for obscuring the manufacturer's identifying product plate. Plaintiffs suffered injuries as a result of university's alleged negligence. The Circuit Court of Davidson County, Tennessee, Judge Walter C. Kurtz granted university's motion for summary judgment and Plaintiffs appealed. The decision of the trial court is reversed and case remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA COTTRELL, J., joined.

Timothy T. Ishii, Nashville, Tennessee, for the appellants, Gary Edwin Bennett and Thomas W. Cantley.

Peggy L. Tolson, Brentwood, Tennessee, for the appellee, Trevecca Nazarene University.

## OPINION

Defendant, Trevecca Nazarene University (TNU), experienced partial power failure at approximately 10:00 a.m. on December 26, 2001. TNU campus administrator, Michael Yonnotti (Yonnotti), and TNU maintenance supervisor, Bill Adams (Adams), discovered that multiple buildings on the campus were without power or had power at reduced levels. Attempting to assess the outage themselves, Yonnotti conducted a continuity check on the fuses with Adams' voltmeter, thereby, damaging the voltmeter. Realizing that repair of the power outage was beyond their

expertise, Yonnotti called Stones River Electric Company (Stones River). TNU alleged that Yonnotti told Stones River that he thought that the partial power failure was due to a blown 600 volt fuse in a three-phase switchgear cabinet.

Plaintiffs, Gary Bennett (Bennett) and Thomas Cantley (Cantley), were employed by Stones River as electricians. Both electricians were only qualified and trained to work on low voltage equipment, which according to industry standards, means 600 volts or less. Stones River sent Plaintiffs to the TNU campus to locate and repair the problem, where they were met by Yonnotti and Adams. Plaintiffs claim that upon arrival and in response to their inquiry, Yonnotti advised them that the switchgear operated at low voltage. It was disputed by the parties whether the switchgear cabinet containing the equipment had a warning sign that the equipment contained high voltage and it was further disputed by the parties whether the manufacturer's product identification plate had been painted over by TNU.

Plaintiffs confirmed that the disconnect switch was in the disconnect position and thereafter, Bennett decided to apply his standard 600 volt maximum voltmeter to each of the three phase fuses. Cantley aided Bennett in operating the voltmeter. There was no current in the first fuse tested. However, when testing the second fuse, Plaintiffs were hit by a high voltage current operating at an unexpected 4160 volts, causing the fuse to explode in a ball of fire, which caused severe burns to both Cantley and Bennett. It was subsequently discovered that even though the disconnect switch was in an open position, one or more of the arc blades were stuck in a closed position, which Plaintiffs claim was the result of TNU's negligent failure to periodically inspect and maintain its electrical equipment.

On December 20, 2002 Bennett filed a Complaint against TNU in the Circuit Court of Davidson County, Tennessee. On December 23, 2002, Cantley filed an almost identical Complaint. Plaintiffs alleged that based upon TNU's negligent representation of the involved fuse being low voltage, Stones River sent Bennett and Cantley, both of whom were low voltage electricians, to the TNU campus to locate and repair the problem. Plaintiffs claimed that Defendant was liable for negligent misrepresentation causing their injuries. TNU filed its Answer on April 15, 2003. On May 13, 2002, the cases were ordered consolidated by the trial court as having common questions of law and of fact pursuant to Rule 42.01 of the Tennessee Rules of Civil Procedure.

On March 1, 2004, TNU filed a Motion for Summary Judgment, a Statement of Undisputed Facts, and a Memorandum in Support thereof. TNU also filed the depositions of Bennett, Cantley, Yonnotti, and Adams. TNU asserted that it had no duty to Bennett or Cantley, alleging that Plaintiffs were independent contractors. TNU further claimed that because Plaintiffs were injured while making the specific repairs which TNU had contracted with their employer to perform, the independent contractor rule served as a complete bar to recovery. Plaintiffs filed their Response to Defendant's Motion for Summary Judgment, a Statement of Undisputed Facts, and a Memorandum in Support thereof on March 26, 2004.

The Motion was argued on April 2, 2004 and the court took the Motion under advisement. On April 24, 2004, the court entered a Memorandum and Order granting TNU's Motion for Summary Judgment relying on *Blair v. Campbell,* 924 S.W.2d 75 (Tenn.1996). Plaintiffs filed a timely appeal.

Plaintiffs assert three issues on appeal. Plaintiffs contend that (1) the trial court erred in granting Defendant's Motion for Summary Judgment as there are genuine issues of material fact; (2) the court's decision was erroneous under Tennessee precedent regarding the duty of care owed to independent contractors; and, (3) for public policy reasons, the Court should create an exception to the independent contractor rule.

A trial court's determination in a motion for summary judgment is a question of law. *Staples v. CBL Assoc., Inc.*, 15 S.W.3d 83 (Tenn.2000). The standard of review is *de novo* with no presumption of correctness below. *Staples*, 15 S.W.3d at 88. Our task is confined to reviewing the record to determine if the requirements of Tennessee Rule of Civil Procedure 56 have been met. *Staples*, 15 S.W.3d at 88.

## I. Genuine Issues of Material Fact

It is well settled that in a motion for summary judgment, the moving party has the initial burden of producing competent, material evidence reflecting that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn.1993). The evidence presented must be viewed in the light most favorable to the nonmoving party, and the court must draw all reasonable inferences in favor of that party. *Byrd*, 847 S.W.2d at 210. Summary judgment is appropriate only when there are no genuine issues of material fact and when the undisputed material facts entitle the moving party to a judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd,* 847 S.W.2d at 211.

Tennessee Rule of Civil Procedure 56.03 requires that "any motion for summary judgment made pursuant to Rule 56 of the Tennessee Rules of Civil Procedure...be accompanied by a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." The specifications of material facts serve as "road maps" and the trial court should not be required to proceed further if they are not provided. *Owens v. Bristol Motor Speedway, Inc.*, 77 S.W.3d 771, 774 (Tenn.Ct.App.2001).

The trial court in this case, granted TNU's Motion for Summary Judgment based upon the parties' statements of undisputed facts and the *Blair* case. The court stated in its order, "[s]tatements of undisputed facts are of importance because the law of summary judgment allows the trial judge to only consider the facts stated in those statements. *See Owen v. Bristol Motor Speedway*, 77 S.W.3d 771, 774 (Tenn. Ct. App. 2001)." The court then listed both Defendant and Plaintiffs statements of undisputed facts and reasoned that "[b]ased on the above facts and the law as set forth in *Blair v. Campbell*, 924 S.W.2d 75 (Tenn. 1996) and *Shell Oil Co. v. Blanks*, 46 Tenn. App. 539, 330 S.W.2d 569 (1959), the [Defendant's] motion is granted." However, Plaintiffs assert that the court erroneously disregarded the parties' depositions which established that there exists a genuine issue of material fact as to whether TNU made an affirmative representation to Plaintiffs regarding

-3-

the amount of voltage in the switchgear cabinet, and thus the court erred in granting TNU summary judgment.

A judge is not bound only to consider the statements of material facts as specified by the parties in determining the merits of a motion for summary judgment. The statements of material facts are designed merely "to assist the court in ascertaining whether there are any material facts in dispute." T.R.C.P. 56.03. Such statements are auxiliary to the motion in order to assist the court in rendering judgment on the motion. *Estate of Jenkins*, No. M2004-01561-COA-R3-CV 2004 WL 2607531, *5 (Tenn.Ct.App.July, 9, 2004). A decision to grant summary judgment must ultimately be based on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Tenn. R. Civ. P. 56.04. Thus, "while the Tenn. R. Civ. P. 56.03 concise statement points the court to the portions of the record that are particularly relevant to the summary judgment motion, it does not replace the evidentiary materials on which it is based." *Estate of Jenkins*, 2004 WL 2607531 at *6. We therefore may consider the depositions of the parties in determining whether the trial court's decision to grant TNU summary judgment was proper.

Plaintiffs assert that TNU personnel negligently informed them that the switchgear cabinet was low voltage. Cantley specifically stated in his deposition,

> Q. All right. What did the maintenance man tell you?
> A. Well, I asked him what the voltage was, first thing?
> Q. You asked him?
> A. Uh-huh.
> Q. Now is that because Mr. Bennett was still getting materials out or his equipment?
> A. Yes, I mean that is like it is first nature. If you told me to go work on a panel at your house or anything, I'm going to ask what the voltage is before I even go in it.
> Q. And what did the maintenance man tell you?
> A. He said it was 480.
> Q. So he told you it was 480?
> A. Uh-huh.
> Q. And you remember that very specifically?
> A. Yep.

Bennett also believed that Stones River had been informed that the power outage was a result of a blown low voltage fuse. Bennett stated in his deposition,

> Q. Based on what Mr. Starky told you were you thinking that it was involving voltage above 600 volts or less than 600 volts?
> A. Less than 600 volts.
> Q. What was it about what he said that made you think it was less than 600 volts?

A.      He would not call us out if it was over 600 volts. I just take it, you know, as being 480 unless somebody else told me, well under 600 volts.

Q.      I'm sorry – I missed part of that. Did you say he would not have called you out if it had been above 600 volts?

A.      Right. If he had known, he would have went straight to the Power Generation Company.

However, TNU claims that it never made any affirmative representations to Plaintiffs regarding the amount of voltage contained in the switchgear cabinet, and any information regarding the amount of voltage was given only to their employer, Stones River. Yonnotti stated in his deposition,

Q.      As far as you understand, Bill explained – Mr. Adams explained the problem to him?

A.      Yes.

Q.      You don't recall specifically having a discussion with Mr. Bennett or Mr. Cantley about the voltage of the box?

A.      No, I don't recall having a conversation like that.

Q.      Did they inquire with you about what the voltage of the box was?

A.      No, sir...
...

Q.      So as you sit here today, your recollection is and your testimony is that you did not tell the folks from Stones River Electric that it was high voltage?

A.      That is correct. I didn't tell them.

Q.      And they didn't ask?

A.      They didn't ask.

Q.      And you had read this plate before they got there and you knew that since it said 600 amps that it actually had to be more than 600 volts?

A.      That's correct.

Q.      And by your definition, that's high voltage?

A.      That's correct.

Adams also did not remember Yonnotti or himself informing Plaintiffs about the voltage contained in the switchgear cabinet. Adams stated in his deposition,

Q.      Which of these two gentlemen did you speak to or maybe you spoke to both of them? Tell me about that interaction.

A.      I think Mike talked to them more than I did. I just kind of took a back seat to it at that point. I might have said hi or something. I don't remember that. As far as carrying on a conversation, no.

> Q. Did you overhear conversations between Mike and either of these two gentlemen?
>
> A. Yes. I heard Mike explain what the problem was.
>
> Q. Who did he explain it to and what did he say as best as you can recall?
>
> A. I'm thinking he talked to this gentleman here –
>
> Q. That's Gary.
>
> A. – and asked if – I'm reluctant to say anything at this point because I don't really recall too much of the conversation.
>
> Q. I understand. Just tell me what you think you remember.
>
> A. Well, we assumed that we had a fuse problem, I think he talked to Gary about the fuse, about maybe possibly replacing the fuse or whatever, but that's about all I can remember.

Based on the parties' depositions, what Plaintiffs asked TNU personnel and what was told to them upon arriving at the TNU campus is a disputed question of fact. However, we must still determine whether summary judgment was proper under *Blair*, assuming that TNU personnel affirmatively represented to Plaintiffs that the switchgear cabinet was low voltage.

## II. Independent Contractor Rule

In granting TNU's Motion for Summary Judgement, the court relied on *Blair v. Campbell*, 924 S.W.2d 75 (Tenn.1996). In *Blair*, plaintiff contractor was hired to repair a defective roof and sustained injuries when the wood supporting the gutter collapsed, causing the ladder to turn and thereby, throwing plaintiff to the ground. *Blair*, 924 S.W.2d at 76. The court held that while the owner of property typically "owes a contractor the duty to provide a reasonably safe workplace...this duty does not apply when the contractor is injured while making the specific repairs called for in the contract." *Blair*, 924 S.W.2d at 76. The court denied plaintiff relief, reasoning that although the contractor "was not told of the extent of the damage to the roof, and perhaps could not have known until he climbed the ladder, this is immaterial...; the repair contract itself is sufficient to put the contractor on notice of a defect in the premises, and it is the contractor's responsibility to determine the extent of the defect." *Blair*, 924 S.W.2d at 77. The court further stated,

> [T]he law of this state, and of all others that we are aware, perceives danger as a legitimate consideration in the bargaining process, as long as the contractor has a reasonably specific idea of the perils that he or she will encounter. For example, it is common knowledge that construction workers on skyscrapers and other very tall structures earn more than their co-workers in less dangerous positions. Simply put, danger is often treated as one of the many factors in the pricing of an economic transaction.
>
> Furthermore, the policy of placing the risk of incurring physical harm during a repair job on a contractor holding himself or herself out as an expert in that work, as opposed to the lay premises owner, is not unjustified, at least as long as the owner does not willfully or intentionally harm the contractor. To hold otherwise would be to require the untutored

owner to inspect the roof for defects before calling a roofing contractor; it would also require the owner to inspect the electrical box before employing an electrician.

*Blair*, 924 S.W.2d at 78.

TNU asserted and the trial court agreed that because Plaintiffs were independent contractors with whom TNU had contracted to provide electrical services and Plaintiffs were injured in rendering those services, Plaintiffs were precluded from recovery under *Blair*. It is TNU's position that even if Plaintiffs had inquired of TNU personnel whether the switchgear cabinet was low voltage, and TNU personnel negligently informed them that it was, Plaintiffs would still be precluded from recovery because *Blair* only provides recovery for willful or intentional harm to contractors. We believe this reading stretches the *Blair* case too far.

In the instant case, Plaintiffs assert that they inquired whether the switchgear cabinet on TNU's campus was low voltage and that TNU personnel affirmatively responded on two occasions that it was. Plaintiffs claim that their injuries were proximately cause by these alleged negligent misrepresentations. This creates a situation different from *Blair*, where the contractor made no inquires and the homeowner made no assertions regarding the stability of the roof for which they had contracted to be repaired.

The record before the Court leaves some inadequately answered questions. According to Plaintiffs, they were low-voltage technicians dispatched by their employer to TNU campus following a call from Mr. Yonnotti. In his deposition, Mr. Yonnotti testifies that he knew that the voltage in the box was high voltage when he called Stones River Electric, but neither told the secretary about the voltage, nor was he asked about it. He later says:

> A.    I didn't actually mention it to them. I mentioned it to Darrell, the service manager, that it was 600 volts or more. So what he relayed to them, I'm not really sure. What I told Darrell was 600 volts or more.

Plaintiff Cantley testifies that Mr. Adams advised him that the power box voltage was 480 in response to a specific inquiry by Mr. Cantley. Adams does not recall such a conversation.

Mr. Bennett testified that the maintenance man (without specifically identifying either Yonnotti or Adams) told him in response to a specific inquiry that the voltage was 480 volts; that he further inquired, "are you sure?" to which the maintenance man responded, "yes sir, I am sure." Neither Yonnotti nor Adams recalls such a conversation.

Since the case is before the Court on summary judgment, we are not called upon to resolve this factual dispute but rather to accept Plaintiffs' version. *Byrd*, 847 S.W.2d at 210.

Assuming that in this contractual business setting involving neither fiduciary nor confidential relationship, Defendant had no duty to inform Plaintiffs of the voltage in the power box, (*See Macon County Livestock Market, Inc. v. Kentucky State Bank, Inc.*, 724 S.W.2d 343, 349 (Tenn.Ct.App.1986)) we are confronted with a separate rule that where a party under neither duty nor obligation to speak chooses to do so, either voluntarily or in response to an inquiry, he assumes a duty to speak truthfully. This rule, having its apparent origin in cases involving vendor and purchaser, is succinctly stated in *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411 (1st Cir.1985).

> The district court dismissed the misrepresentation count because "[t]here was no fiduciary duty here. The parties dealt at arm's length with each other, and there was no peculiar duty to speak. There were no material misrepresentations on which the buyers relied."

What we face here, however, are allegations of partial or incomplete statements that may by their incompleteness be actionable. Restatement of Torts (Second), §§ 529, 551(2)(b). There is much case law in Massachusetts supporting the proposition that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party.

> "Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . .' *See* Harper & James, Torts, § 7.14. *See also* Restatement: Torts, § 529; Williston, Contracts (2d ed.) §§ 1497-1499." *Kannovos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969).

*See also Maxwell v. Ratcliffe*, 356 Mass. 560, 562-63, 254 N.E.2d 250 (1969) ("Because the question of the dryness of the cellar had been raised expressly, there was special obligation on the brokers to avoid half truths and to make disclosure at least of any facts known to them or with respect to which they had been put on notice."); *Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 322,446 N.E.2d 681 (1983) ("[T]here is no suggestion that the defendants made a partial disclosure or stated a half truth which may be tantamount, under certain conditions, to a falsehood if there is no further expatiation."); *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674 (1983); *Catalina Yachts v. Old Colony Bank & Trust Co.*, 497 F.Supp. 1227 (D.Mass.1980).

This duty to avoid misrepresentations is so strong that the deceived party is not charged with failing to discover the truth. *Snyder v. Sperry & Hutchinson Co.*, 368 Mass. 433, 446, 333 N.E.2d 421 (1975) ("[I]f the seller's representations are such as to induce the buyer not to undertake an independent examination of the

pertinent facts, lulling him into placing confidence in the seller's assurances, his failure to ascertain the truth through investigation does not preclude recovery.").

*V.S.H. Realty, Inc.*, 757 F.2d at 414-15. *See also Kannavos v. Annino*, 247 N.E.2d 708, 711-12 (Mass.1969).

The rule was recognized under Alabama, Massachusetts, Florida and Mississippi law by the United States District Court for the Middle District of Alabama in *Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268 (M.D.Ala.1999) wherein the Court held:

> Under the laws of the four relevant jurisdictions, a duty to disclose may exist where one voluntarily undertakes to speak but fails to prevent his or her words from being misleading, or where one party has knowledge of material facts to which the other party does not have access. *See, e.g., Simpson v. Sto Corp.*, 951 F.Supp. 202, 206 (M.D.Ala.1996), *aff'd*, 145 F.3d 363 (11th Cir.1998); *Thomas v. Halstead*, 605 So.2d 1181, 1184 (Ala.1992); *Hooper v. Barnett Bank of West Fla.*, 474 So.2d 1253, 1257 (Fla.Dist.Ct.App.1985); *V.S.H. Realty, Inc. v. Texaco, Inc.*,757 F.2d 411, 414 (1st Cir. 1985) (applying Massachusetts law); *Guasella v. Wardell*, 198 So.2d 227, 230 (Miss.1967).

*Peters*, 57 F. Supp.2d at 1282.

While Tennessee has not directly addressed this volunteered speech question, previous decisions are analogous. *See Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228 (Tenn.Ct.App.1976). Tennessee has likewise accepted the corollary "Good Samaritan" rule embodied in the Restatement (Second) of Torts section 324 A (1965) providing:

> One who undertakes, gratuitously or for consideration, to render service to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a)     his failure to exercise reasonable care increases the risk of such harm, or
> (b)     he has undertaken to perform a duty owed by the other to the third person, or
> (c)     the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, Section 324A (1965).

The "Good Samaritan" rule is firmly rooted in the common law of negligence. *Artiglio v. Corning Incorporated*, 18 Cal.4th 604, 613, 957 P.2d 1313, 76 Cal.Rptr.2d 479 (Cal.1998). Indeed, "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to a duty of acting carefully, if he acts at all." *Glanzer v. Shepard*, 135 N.E. 275, 276, 233 N.Y. 236 (N.Y.1922).

The Eastern Section of this Court discussed the application of this longstanding rule in *Anderson v. City of Chattanooga*, 978 S.W.2d 105 (Tenn.Ct.App.1998). There, a motorist sued the city for injuries sustained in a collision while traversing an intersection as part of a funeral procession. *Anderson*, 978 S.W.2d at 105. Plaintiff claimed that it was negligent for the city to supply only one police officer to escort the procession and for the officer to leave the intersection before all the vehicles included in the procession had passed through the light. *Anderson*, 978 S.W.2d at 106. The city asserted that it owed no statutory duty to provide officers for the procession, and therefore, it was not liable for injuries resulting from the gratuitous undertaking. *Anderson*, 978 S.W.2d at 107. However, the court, quoting the trial court and relying on the Restatement (Second) of Torts Section 324A, found that the city did, in fact, have a duty and explained, "the duty is that having undertaken to do the job ... the City is obligated to do it adequately and safely." *Anderson*, 978 S.W.2d at 107. The court further noted that although the statute governing funeral processions imposed no specific duty upon the officer to remain at the intersection until all vehicles has passed through the light, that did not mean that the officer had no duty to provide the escort in a safe manner, because even a gratuitous undertaking may give rise to a duty to protect. *Anderson*, 978 S.W.2d at 107.

Whether Plaintiffs can ever survive a comparative fault analysis before a trier of fact remains to be seen. *Pyle v. Prairie Farms Dairy, Inc.*, 777 S.W.2d 286 (Mo.Ct.App.1989). The trial court based its decision to grant summary judgment to Defendant on *Blair v. Campbell*, 924 S.W.2d 75 (Tenn.1996). Doubtless the rule in *Blair* would bar recovery by Plaintiffs in this case under the rule that "the repair contract itself is sufficient to put the contractor on notice of a defect in the premises, and it is the contractor's responsibility to determine the extent of the defect. Under such rule, the owner in *Blair* was "under no duty to provide a reasonably safe workplace to the contractor." 924 S.W.2d at 77.

The duty of TNC in this case arose not from the contract but from the fact that it "chose to speak" as to a critical inquiry when it was under no duty to speak. Taking the evidence of Plaintiffs as true, TNC knew that the power box was high voltage, yet informed Plaintiffs that it was low voltage. Having assumed to speak, TNC was required to speak the truth and did not do so. *Blair* is not applicable under these facts, and Defendant, having chosen the speak, was under this assumed duty; it did not fulfill the duty by providing false information to Plaintiffs.

The judgment of the trial court is reversed and the case remanded for trial on the merits.

Costs of the cause are assessed to Appellants.

_____
WILLIAM B. CAIN, JUDGE