**Gary Edwin BENNETT et al.**

v.

**TREVECCA NAZARENE UNIVERSITY.**

Supreme Court of Tennessee, at Nashville.

Oct. 5, 2006 Session.

March 14, 2007.

Peggy L. Tolson, Brentwood, Tennessee, for the appellant, Trevecca Nazarene University.

David Randolph Smith, Timothy I. Ishii, and Raymond T. Throckmorton, III, Nashville, Tennessee, for the appellees, Gary Edwin Bennett and Thomas W. Cantley.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and GARY R. WADE, JJ., and ADOLPHO A. BIRCH, JR., Sp.J., joined.

We accepted this appeal of a premises liability case to determine whether the "independent contractor rule" adopted in *Blair v. Campbell,* 924 S.W.2d 75 (Tenn. 1996), relieves a premises owner from liability when a premises owner provides an independent contractor inaccurate information germane to the contractor's work. We hold that a property owner has a duty of reasonable care to provide accurate information to an independent contractor if the owner provides specific information germane to the repair after engaging the contractor. Because material facts remain in dispute between the parties in this case about what information the premises owner provided, the trial court erred when it granted summary judgment to the defendant. We affirm the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiffs Gary Edwin Bennett and Thomas W. Cantley, both electricians employed by Nashville's Stones River Electric Company ("Stones River"), were injured in a high-voltage electrical explosion on the premises of defendant Trevecca Nazarene University ("TNU") while they worked to restore power to parts of the TNU campus.

At about 4:00 a.m. on December 26, 2001, a TNU security officer called TNU's maintenance supervisor, Michael Yonnotti, to tell him that some campus buildings had lost their electrical power. Between 7:00 a.m. and 7:30 a.m., Yonnotti called a TNU maintenance technician, Bill Adams, to join him on campus in order to diagnose and correct the problem. Yonnotti and Adams soon located the probable cause of the outage, a malfunctioning switchgear in an electrical equipment cabinet located next to a Nashville Electric Service sub-station on campus. To test their theory of the outage, Adams first engaged a disconnect switch in the cabinet to stop the flow of power to the switchgear. Then, using a voltage meter, Adams and Yonnotti began to test each pair of connections on the switchgear's fuse panel. Upon testing one of the fuses, a spark erupted, causing the voltage meter to fail. The spark and the overloaded voltage meter caused Yonnotti to consult the manufacturer's rating plate on the switchgear, which, Yonnotti testified in his deposition, stated that at least 600 amperes of electricity ran through the equipment. From his professional experience, Yonnotti knew that "more than 600 volts" were at issue. Realizing that TNU needed professional electricians to diagnose and repair this high voltage problem, Yonnotti telephoned Stones River.

There is considerable variation among the testimony of Yonnotti, Adams, Cantley, and Bennett about whether Yonnotti or Adams informed Stones River or Bennett and Cantley that high voltage was present at the switchgear panel. Yonnotti indicated that when he placed the telephone call he told the Stones River service manager that high voltage was present, but he told neither Bennett nor Cantley that TNU had a high voltage problem.

Q: [Y]ou did not tell the folks from Stones River Electric [Bennett and Cantley] that [the switchgear in need of repair] was high voltage?

A: That's correct. I didn't tell them.

Q: And they didn't ask?

A: They didn't ask.

. . . .

I didn't actually mention it to them. I mentioned it to Darrell, the [Stones River] service manager,[1] that it was 600 volts or more. So what he relayed to them, I'm not really sure. What I told Darrell was 600 volts or more.

In his deposition, Adams remembered few details of the conversations before the accident, except that it was primarily Yonnotti who spoke to Bennett before the accident.

Q: Which of these two gentlemen [Bennett and Cantley] did you speak to or maybe you spoke to both of them? Tell me about that interaction.

A: I think [Yonnotti] talked to them more than I did. I just kind of took a back seat to it at that point. I might have said hi or something. I don't remember that. As far as carrying on a conversation, no.

Q: Did you overhear conversations between [Yonnotti] and either of these two gentlemen?

A: Yes. I heard [Yonnotti] explain what the problem was [to Bennett]. . . . I'm reluctant to say anything at this point because I don't really. recall too much of the conversation. . . . I think he talked to [Bennett] about the fuse, about maybe possibly replacing the fuse or whatever, but that's about all I can remember.

During his testimony about the voltage meter that Adams and Yonnotti initially used to test the switchgear, Adams did corroborate Yonnotti's assertion that they both knew that TNU faced a high voltage problem:

Q: How big of a spark?

A: Just a small spark but a spark. Enough to back away. [Yonnotti] looked at me and told me, he said, ["]This is out of our hands, [w]e need to get an electrician out here.["]

. . . .

Q: Was it a big enough spark that it burnt up your meter?

A: Yeah, it had to be. My meter was rated at 600 volts.

In a later response, Adams added:

A: Well, when my volt meter blew, I knew that we were dealing with something more than 600 volts. [When the meter blew is] when I knew definitely. That proved it.

In their depositions, Bennett and Cantley offered a very different version of these events. Cantley asserted that he understood that low voltage was present, both because of what Yonnotti or Adams allegedly told him and because of the type of voltage meter Yonnotti and Adams used in their first test:

Q: What did the maintenance man[2] tell you?

. . . .

A: He said it was 480 [volts], and he said he went to try his little meter in there and it blowed [sic] his meter up.

Q: What kind of little meter did he have?

A: I think it might have been a Radio Shack 200 volts.

Bennett testified that the Stones River dispatcher provided him with no information about the voltage. Bennett assumed the voltage to have been 600 or less be-

1. Except for Bennett's and Cantley's depositions, the record contains no testimony from other Stones River personnel.

2. It is unclear from Cantley's testimony whether "the maintenance man" is Yonnotti or Adams.

cause "[i]f it was high voltage, I'm not qualified to be around it, I would not even be near it." When he testified about what transpired when they arrived on the TNU campus, Bennett corroborated Cantley's version of the events and added details:

Q: What happened when you [arrived on campus]?

A: [T]here were two men who directed us over to the parking lot where they were. I take it was the head maintenance man [Yonnotti], he was doing all the talking. When I arrived there we pulled right beside the cabinet. And he told me what was going on. And I said, "well, what's the voltage?" He said, "it is 480 volts." I said, "are you sure[?]" He goes, "yes, sir, I'm sure." I said, "okay."

. . . .

Q: Did he [Yonnotti] tell you what they had done prior to you arriving?

A: He told me that he had put his meter on [the switchgear fuse] and it blew up, well shorted out or made it where his meter would not work. And I physically seen [sic] the meter. . . . I call it a Radio Shack meter. It is more or less for electronics and nothing other than 240 volts, if that.

What happened next is not disputed. Bennett and Cantley began their work on the switchgear. Bennett first double-checked to make sure that the switchgear was powered down, then Bennett and Cantley used their own voltage meter to test the fuses on the switchgear. As expected, the first fuse carried no electricity. The second carried 4,160 volts. A high-

voltage arc of electricity generated a blinding flash of light and a ball of fire, engulfing Bennett and reaching Cantley. Both men were injured, although Bennett was much more badly burned than Cantley because Cantley stood away from the cabinet holding the voltage meter while Bennett placed the meter's leads on the fuses. Subsequent investigation indicated that Bennett had failed to see through a sight glass that one of the metal blades inside the switchgear had not disengaged. In addition, the parties did not dispute that high voltage warning signs were not clearly visible on the front of the cabinet at the time of the accident.

In their deposition testimony, Bennett and Cantley described the sharp distinction that electricians draw between servicing "low voltage" and "high voltage" equipment. Whatever their level of training, the vast majority of electricians work only on "low voltage" wiring and fixtures, those rated to carry 600 volts or less. Generally, these electricians rely on the presence of code-mandated signs that warn them of "high voltage" wiring and fixtures, those rated to carry more than 600 volts. When they see these large, explicit warning signs,[3] they know that they must call in specialists. Electrical equipment also generally has a rating plate attached to it which states the maximum voltage at which the equipment safely operates, although the equipment may not, in a specific application, operate at the maximum capacity.

Bennett and Cantley received medical and other benefits from Stones River under the workers' compensation statute. In addition, on December 20, 2002, Bennett

---

3. Nashville requires such warning signs. *See* Ordinance No. BL2000–343, Government of Nashville and Davidson County (Aug. 4, 2000) (amending Metro Code § 16.20.140(A) to make the 1999 National Electrical Code the electrical code of Nashville); National Fire Safety Association National Electric Code, art. 110, § 34(c) (1999) (requiring large conspicuous warning signs on equipment carrying 600 volts or more).

filed the complaint in this case in the Circuit Court for Davidson County, alleging, inter alia, that TNU breached the duty of care it owed to him while he was on its premises because TNU (1) misstated the voltage that the switchgear carried, (2) failed to provide conspicuous high voltage warning signs on the switchgear's cabinet, and (3) did not conduct the proper routine maintenance on its electrical equipment. Bennett also alleged that TNU was negligent per se for having failed to provide conspicuous high voltage warning signs on the cabinet, in violation of Nashville's municipal code. Cantley filed a nearly identical complaint on December 23, 2002. The trial court subsequently consolidated the complaints.

After both parties engaged in discovery, including the depositions referenced above, TNU moved for summary judgment. TNU contended that it was entitled to summary judgment because of the "independent contractor rule" adopted in *Blair v. Campbell,* 924 S.W.2d 75 (Tenn.1996). That rule, TNU argued, relieves a premises owner of its customary duty of reasonable care to an independent contractor when the contractor is injured in the course of servicing the matter that the property owner engaged the contractor to repair. After a hearing, the trial court accepted TNU's argument and granted it summary judgment on April 21, 2004.

Bennett and Cantley appealed, and the Court of Appeals reversed. Analyzing *Blair,* the Court of Appeals held that the independent contractor rule as articulated therein did not apply to the facts of this case. The intermediate appellate court distinguished *Blair* from this case because, in *Blair,* the property owner made no statements about the matter under repair to the injured contractor. Perceiving a gap in Tennessee law, the Court of Appeals fashioned a new "voluntary speech rule," under which the *Blair* rule does not apply if the property owner makes any statements to the contractor about the contemplated repair. If such statements are made, then the premises owner maintains a duty of reasonable care toward the independent contractor insofar as the owner's statements are not "truthful" or if they do not reflect information germane to the repair to which the owner, but not the contractor, has access.

We accepted this appeal to decide whether the independent contractor rule adopted in *Blair* relieves a premises owner from liability when a premises owner provides an independent contractor inaccurate information germane to the contractor's work.

## DISCUSSION

### Standard of Review

 We review a trial court's grant of summary judgment de novo. *See Blair v. W. Town Mall,* 130 S.W.3d 761, 763 (Tenn. 2004). Based on the parties' respective statements of undisputed facts, *see* Tenn. R. Civ. P. 56.03, and "the pleadings, *depositions,*[4] answers to interrogatories, and

4. In its order granting TNU summary judgment, the trial court stated, "[s]tatements of undisputed facts are of importance because the law of summary judgment allows the trial judge to only consider the facts stated in those statements." As the Court of Appeals observed, this statement of law overlooks the fact that Tennessee Rule of Civil Procedure 56.04 permits a trial court to consider "depositions" when weighing a summary judgment motion. At the same time, we emphasize the importance of attorneys using Rule 56.03 statements of material facts to their fullest. A trial court should not need to sift through lengthy deposition testimony to find any information that is essential to its summary judgment decision. Nor should an appellate court be required to do likewise when reviewing decisions to grant or deny summary judgment.

admissions on file, together with the affidavits, if any" a grant of summary judgment is appropriate only when (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) based on the undisputed facts, "the moving party is entitled to a judgment as a matter of law," Tenn. R. Civ. P. 56.04 (emphasis added). *See also W. Town Mall,* 130 S.W.3d at 764. In addition, we "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall,* 847 S.W.2d 208, 210–11 (Tenn.1993).

### *Blair* Does Not Control This Case

The trial court determined that the independent contractor rule articulated in *Blair* and *Shell Oil Co. v. Blanks,* 46 Tenn. App. 539, 330 S.W.2d 569, 571 (1959), entitles TNU to summary judgment on the facts of this case.

■ We disagree. In *Blair,* we summarized Tennessee's law on a property owner's duty to maintain a safe premises for an independent contractor as well as an exception to that duty, the independent contractor rule:

It is well-settled that an owner generally owes an independent contractor hired to perform work on the premises a duty to provide a reasonably safe place in which to work. This general duty includes the specific responsibility of either removing, or warning the independent contractor of, any hidden or latent dangers on the property.

. . . .

"An exception to the general rule is recognized where the risks arise from, or are intimately connected with, defects of the premises or of machinery or appliances located thereon which the contractor has undertaken to repair. As to the

contracts for such repair work, it is reasoned that the contract is sufficient in itself to impart notice of a defect, the extent of which the repairman must discover for himself. This is merely to say that one assumes the risk of a known danger or of an undertaking which is inherently dangerous."

924 S.W.2d at 76–77 (quoting *Blanks,* 330 S.W.2d at 571 (other citations omitted)).

Tennessee appellate courts have also noted the inherent dangerousness of electricity. *See, e.g., Wilson v. Elec. Power Bd. of Chattanooga,* 544 S.W.2d 92, 96 (Tenn. 1976) (stating that high-tension electricity lines are "dangerous instrumentalities"); *Havron v. Sequachee Valley Elec. Co-op.,* 30 Tenn.App. 234, 204 S.W.2d 823, 824 (1947) ("Electricity has been described as being potentially the most dangerous of the utilities commonly used. . . ."). This precedent led the trial court to conclude that TNU's general duty of care was overcome by the more specific responsibility of Stones River's servants, Bennett and Cantley, to bear any risks "that arose from or were intimately connected with" the "inherently dangerous" activity they "undertook," a repair of an electrical switchgear.

The Court of Appeals disagreed, concluding that a factual distinction between *Blair* and this case renders *Blair* inapposite. We agree with the intermediate appellate court on this point. In *Blair,* the homeowner, Campbell, hired the contractor, Blair, to repair a leaky roof over a front porch. When Blair climbed up a ladder, which leaned against a gutter, to inspect the progress of his assistant's work, the wood near the gutter gave way, turning the ladder and throwing Blair to the ground. Blair sued Campbell to recover for the injuries he sustained. We applied the independent contractor rule to

defeat Blair's claim because the contract between the parties to repair a leaky roof gave Blair sufficient notice that he might face danger in connection with the roof repair. 924 S.W.2d at 77.

In this case, TNU allegedly did more than contract with Stones River to repair the malfunctioning switchgear. Bennett and Cantley assert that TNU agents affirmatively told them after they had arrived on campus to begin the repair that 480 volts ran through the switchgear. It is clear to us, then, that this case presents a different issue. Where the contractor in *Blair* had only the information available from his agreement with the homeowner to frame his investigation of the problem, the plaintiffs in this case allegedly also had assertions from the premises owner's agent that, if true, would determine whether they would try to repair the switchgear themselves or defer to more highly trained experts. Thus, *Blair's* and *Blanks'* focus on the subject matter of the repair contract is simply an inadequate framework in which to analyze whether a premises owner has a duty of reasonable care in this case.

## A Duty to Provide Accurate Information

■ Although the Court of Appeals fashioned a new "voluntary speech rule" to cover the facts of this case, we rely on two well-established principles of Tennessee tort law, the voluntary assumption of a duty and negligent misrepresentation, to impose a duty of reasonable care on a premises owner to provide accurate information to an independent contractor if the owner provides specific information germane to the repair after engaging the contractor.

### Voluntary Assumption of a Duty

■ " 'One who assumes to act, even though gratuitously, may thereby become

subject to the duty of acting carefully.' " *Biscan v. Brown*, 160 S.W.3d 462, 482–83 (Tenn.2005) (quoting *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn.2000)). Our state's courts have applied this principle in a variety of factual contexts. *See, e.g., id.* at 467, 483 (adult who supervised underage drinkers at a house party assumed a duty of care vis-a-vis a motorist injured in an alcohol-related traffic accident); *Nidiffer v. Clinchfield R.R. Co.*, 600 S.W.2d 242, 246 (Tenn.Ct.App.1980) (railroad had a duty of reasonable care to its employees to select a solvent group life insurance carrier); *cf. Stewart v. State*, 33 S.W.3d 785, 787–88, 793–94 (Tenn.2000) (state trooper did not assume a duty to control the actions of local police officers at the scene of an arrest); *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 104 (Tenn.Ct.App.2001) (employer of an intoxicated employee driving home from work did not assume a duty vis-a-vis an injured motorist); *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 529 (Tenn.Ct.App.1995) (maintenance company did not assume a duty via-a-vis a patron who rode on top of an elevator at a tourist attraction).

We have no difficulty applying this well-worn principle to this case. If, as Bennett and Cantley allege, a TNU employee volunteered to Bennett or Cantley that the switchgear carried only 480 volts, then TNU assumed a duty of reasonable care to make certain that this statement was accurate.

### Negligent Misrepresentation

This case also implicates our law of negligent misrepresentation. Adopted by us in *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240, 242–43 (Tenn. 1972), the Restatement (Second) of Torts's section on negligent misrepresentation, in pertinent part, provides:

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977). We have previously called section 552 our "guiding principle in negligent misrepresentation actions against other professionals and business persons." *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). It also guides us to a resolution of this case.

Applying the plaintiffs' allegations to the framework of section 552 supports the potential imposition of a duty in this case. "In the course of [its] business," TNU, through its agent Yonnotti, allegedly supplied the plaintiffs with "information," that the switchgear operated at 480 volts, to "guide" them in fulfilling their obligation in the "transaction," the repair of the switchgear. As a result, section 552 demands that TNU must have "exercise[d] reasonable care or competence in obtaining or communicating" any "information," in this case the amount of voltage.

We emphasize the narrowness of our holding on this point. Although we would impose a duty on a premises owner under the facts alleged here, we note that section 552 would impose liability on a party only if "he fails to exercise reasonable care or competence in obtaining or communicating the information." In the typical case in which a lay premises owner engages an independent contractor to complete a repair and thereafter provides inaccurate information germane to the repair, we ex-pect that it would be unusual for a lay owner *not* to have exercised reasonable care. The lay premises owner's lack of competence and skill in the independent contractor's specialty would likely make any inaccurate statements still within the bounds of reasonable care. Yet we can conceive of a case in which the relative competence and skill of the premises owner (or its agents) and the independent contractor (or its agents) is much more evenly matched; in such an atypical situation, an imposition of liability on the premises owner might be warranted.

■ Because material facts remain at issue between the parties about what statements, if any, TNU made to Stones River or Bennett and Cantley about the voltage running through the switchgear, we conclude, as did the Court of Appeals on a different basis, that the trial court erred in granting TNU summary judgment.

## CONCLUSION

For the reasons stated above, the trial court erred in granting summary judgment to TNU. We affirm the judgment of the Court of Appeals and remand the case to the trial court for further proceedings consistent with this opinion. The costs of this appeal are taxed to Trevecca Nazarene University, and its surety, for which execution may issue, if necessary.