# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 14, 2016 Session

## VICKI MATHERNE, ET AL. v. JERRY WEST, ET AL.

**Appeal from the Circuit Court for Sevier County**
**No. 2012-1383-III     Rex Henry Ogle, Judge**

---

**No. E2015-02061-COA-R3-CV-FILED-OCTOBER 28, 2016**

---

This appeal concerns premises liability in a slip and fall case. Vicki Matherne and Rodney Matherne ("Plaintiffs") sued Jerry West and Carolyn West ("the Wests"), owners of a vacation cabin rented by the Mathernes, and American Patriot Getaways ("APG"), which managed the cabin, (collectively, "Defendants") after Mrs. Matherne injured herself falling off an elevated parking level at the cabin. Defendants filed a motion for summary judgment. The Circuit Court for Sevier County ("the Trial Court") granted Defendants' motion, finding that any hazardous condition was open and obvious and that Mrs. Matherne was at least 50% at fault. Plaintiffs appeal to this Court. We hold that there are genuine disputed issues of material fact regarding what Defendants could or should have done to prevent the risk of a fall from the elevated parking level and whether Mrs. Matherne was at least 50% at fault. Therefore, the Trial Court erred in granting Defendants' motion for summary judgment. We reverse the judgment of the Trial Court and remand this case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Timothy J. Gudmundson, Knoxville, Tennessee, for the appellants, Vicki Matherne and Rodney Matherne, individually and on behalf of Samuel Troxclair.

Kenneth W. Ward, Knoxville, Tennessee, for the appellees, Jerry West, Carolyn West, and American Patriot Getaways, LLC.

# OPINION

## Background

In December 2011, Plaintiffs and their family took a vacation to Sevier County, Tennessee. Plaintiffs, Louisiana residents, rented a cabin called "Bear House Rock" owned by the Wests and managed by APG. Plaintiffs' vehicles parked at the cabin were a rented Yukon and Mr. Matherne's pickup truck. The cabin had two levels of parking—a lower level and an upper level, which was elevated and on a hill. A black railing surrounded a portion of the upper parking level but not the full length of both sides as shown in exhibit 8 to Mrs. Matherne's deposition submitted by Defendants in their statement of undisputed material facts.



The day after arriving, Mrs. Matherne went out with her family for the evening. The Yukon was parked on the upper parking level. Mrs. Matherne took her granddaughter to the Yukon and leaned into the Yukon to buckle her granddaughter in the car. As Mrs. Matherne exited the vehicle by backing out and down, she fell off the upper parking level to the lower parking level and allegedly injured her right arm.

In December 2012, Plaintiffs sued Defendants for damages related to Mrs. Matherne's fall. Defendants filed a motion for summary judgment. Defendants

submitted Mrs. Matherne's deposition as an exhibit to their statement of undisputed material facts, which we quote from in part:

Q. But what I would like for you to do in your own words is tell me what you believe that either Jerry West, Carolyn West, who are the two owners of the cabin, or American Patriot Getaways, LLC, either did or didn't do that caused you to fall.
A. Like if I would have owned it, what I would have done to make -- to assure people wouldn't fall? Is that what you're asking me?
Q. Well, no. I just want to know what you believe that the defendants did that either caused you to fall or didn't --
A. Well, proper lighting, for one.
Q. Okay. Tell me what proper lighting would have been.
A. Proper lighting would have been maybe lighting that's somewhere pointed directly onto that area or perhaps some striping paint that is visible at night.
Q. Okay.
A. Maybe some reflectors on the black part itself because, once that motion detector light goes off, the sky is it.
Q. Sure. Now, let's take these one at a time.
A. Okay.
Q. If there had been lighting shining directly on the area where you fell, how would that have prevented you from falling based on what you've described as how you fell?
A. I would have known not to reach for the rail even though I saw it out the periphery of my vision.
Q. Okay. How would you have known not to reach for the railing?
A. Because if it was my railing, I would have had it go all the way to the end and I would have had reflectors, meaning --
Q. Okay. Let's back up, because we're getting into a lot of -- you told me three things. You talked about proper lighting.
A. Correct.
Q. You're talking about a striping paint and you talked about reflectors.
A. Right.
Q. So what I want to talk to you about is the lighting, that if there had been lights shining directly on the area where you fell, how would that have caused or prevented you from falling given the way that you described how you fell?
A. It wouldn't have.

***

-3-

Q. Okay. Well, then, let's go back to my question. I want you to tell me what my clients did or didn't do that caused you to fall.
A. Okay. Not extending the safety -- I don't know what you want to call it, fence.
Q. The black wrought iron fence?
A. Right.
Q. Okay.
A. All the way to the end.
Q. Now, based upon what you've told me already, that before you fell you knew that the black wrought iron fence did not extend all the way to the road --
A. Correct.
Q. And before you fell, you knew that there was a drop-off of differing heights depending upon how close you were to the road.
A. Correct.

***

Q. Now, my question was, if you were able to put your left foot down entirely on the concrete, why were you unable to put your right foot down entirely on the concrete?
A. I'm not saying I was or wasn't. I attempted to do that.
Q. Okay. And my question, was there room for you to put your right foot down entirely on the concrete when you removed it from the step board?
A. Yes.

***

Q. And why is it only possible that you would not have fallen if you had both feet flat on the concrete?
A. There could be multireasons why.
Q. List them all, please.
A. I mean, if I came down faster on that, I might have lost my footing on that foot and went to fall and there was nothing to stop me from falling off the edge.
Q. All right. And you knew that there was nothing to stop you from falling off the edge when you came out of the house with your granddaughter?
A. In that section that the Yukon was pulled up -- and remember, the back door was open here.
Q. And you knew --
A. Maybe I misjudged a little, but –

-4-

Q. Ma'am, my question is, when you and your granddaughter left the house, you knew that the black fence did not extend the entire way?
A. Correct.
Q. And when you and your granddaughter left the house and walked up through there, you knew that there was a risk of falling off of the ledge; correct?
A. There is a risk I could fall off this chair. So, yes, correct.
Q. So you had already warned the boys about that risk by prohibiting them from playing up there?
A. I didn't warn them of a risk. I told them they were not allowed up there.

A hearing was conducted on Defendants' motion for summary judgment. In September 2015, the Trial Court entered a detailed order granting summary judgment to Defendants which reads as follows, in part:

Further, pursuant to Rule 56.04 of the *Tennessee Rules of Civil Procedure*, this Court finds the following undisputed material facts:
1. On December 28, 2011, Vicki Matherne and her family traveled from their home in Louisiana to Sevier County, Tennessee.
2. Mrs. Matherne came to Tennessee with her husband Rodney, her son Sam and two of his friends, her daughter Stephanie and Stephanie's fiancé Stephen, and Mrs. Matherne's daughter Sophia and granddaughter Shea.
3. The family traveled in two vehicles, a rented Yukon and Mr. and Mrs. Matherne's pickup truck.
4. Vicki Matherne and her family rented a property located at 607 Quill Gordon Court in Pigeon Forge, Tennessee.
5. Mrs. Matherne took care of the rental arrangements for the property by booking online.
6. Mrs. Matherne and her family arrived at the property around 1:00 or 2:00 a.m. after driving straight through from Louisiana, a 12-hour drive.
7. When Mrs. Matherne and her family arrived at the rental office, they used the night drop pickup box to pick up keys for the property.
8. Mrs. Matherne and her family were staying in a cabin known as "Bear House Rock".
9. The cabin has two levels of parking areas outside the front.
10. When Mrs. Matherne booked this particular cabin online she had seen pictures on the advertisement that showed the upper and lower levels of parking in front of the cabin.
11. That night when Mrs. Matherne arrived at the cabin, she noticed that there were two separate levels for parking.

12. When Mrs. Matherne arrived at the property that night, she saw the black wrought iron rail around a portion of the upper parking area.

13. That first night, Mrs. Matherne could tell that the corner of the upper parking lot that is the highest point was very high from the lower point in the lower parking area.

14. When the family arrived, they backed the pickup truck back into the lower parking area closest to the front door in order that they could unload everything that was in the back of it.

15. When they arrived, Mrs. Matherne got out of the Yukon while it was parked outside in the street.

16. Mrs. Matherne took the key from her husband and went and opened the door and took the kids inside, and then the rest of her family started unloading the pickup truck.

17. Once Mrs. Matherne went inside that first night she did not come back out.

18. Because it was so late when they arrived, the children all just went to bed.

19. The next morning when Mrs. Matherne got up, she walked outside and looked around and noticed that it was too steep to walk around the back of the cabin as it was on a hill, and also observed the upper and lower parking areas in the daylight and noticed there was a big difference in height between the upper and lower levels.

20. The next morning when the children were up, Mrs. Matherne told them not to play on the upper level parking lot because of the height drop, or behind the cabin as it was on a hill.

21. Mrs. Matherne told the children to stay off the upper level parking area, particularly the area at the corner surrounded by the wrought iron fence, as that is the tallest distance from the lowest parking area.

22. The next morning when Mrs. Matherne looked at the parking area, Mrs. Matherne saw the railing around the upper parking level and knew that it did not go all the way to the street.

23. Prior to her fall, Mrs. Matherne knew that because the railing did not go all the way to the street, there was the potential for someone to lose their footing when walking too close to the edge. Therefore, she told the children to stay off of the upper level parking area.

24. Prior to her fall, specifically the next morning after arriving, Mrs. Matherne knew and appreciated that the upper and lower level parking lots had a difference in height and the railing did not go all of the way to the street, and so walking close to the edge and losing footing might cause a person to fall downhill.

25. The next morning, the family decided to park the Yukon on the upper parking area.

26. Mrs. Matherne told her husband to put the Yukon in the upper level parking area.

27. Mrs. Matherne instructed her husband to move the Yukon onto the upper level parking area as both a safety precaution to prevent the kids from going up onto the upper level area to play and to keep the vehicle off the street.

28. When the Yukon was in the upper level parking area, there was enough room to get on the upper level parking area and walk around the Yukon.

29. The next day after they arrived at the cabin, Mrs. Matherne stayed at the cabin while rest of the family went to visit Cades Cove in the Yukon.

30. Mrs. Matherne had never stayed in this cabin before.

31. Mrs. Matherne had been to the Pigeon Forge area three or four other times before.

32. The rest of the family arrived back to the cabin from the trip to Cades Cove at around 2:00 or 3:00 p.m.

33. When the rest of the family arrived back from Cades Cove, the Yukon was parked up on the upper parking area.

34. After the group arrived back from Cades Cove, everybody ate and then Mrs. Matherne and her husband and the three boys and her granddaughter decided to go to Gatlinburg to an arcade.

35. It was around 6:00 p.m. when Mrs. Matherne and her husband decided to take the children to the arcade in Gatlinburg.

36. Mrs. Matherne and her granddaughter, Shea, walked out of the cabin first.

37. After stepping out of the cabin, Mrs. Matherne and her granddaughter walked, holding hands, all the way up the lower parking area to the street, and then turned around and walked up the upper parking area

38. When Mrs. Matherne walked up from the street onto the upper parking area level, she walked with her granddaughter in front of her.

39. Mrs. Matherne's granddaughter then stopped a little bit before the rear door of the Yukon and Mrs. Matherne went by the side of her granddaughter around her to be able to open the door of the Yukon.

40. When Mrs. Matherne went alongside and around her granddaughter, she was on the side closest to the ledge and her granddaughter was closer to the Yukon.

41. As Mrs. Matherne walked around her granddaughter, she was watching where she was going because she knew the drop off was there.

42. The Yukon was pulled up enough that the back door did not hit the railing when it was opened, but Mrs. Matherne could see the railing from the back door of the Yukon.

43. The Yukon was far enough away from the black railing that Mrs. Matherne could have opened the front door of the Yukon.

44. When Mrs. Matherne opened the door, her granddaughter climbed into the Yukon and Mrs. Matherne followed her in and buckled her into one of the rear seats.

45. Once Mrs. Matherne got her granddaughter buckled into the vehicle, she stepped down from the vehicle.

46. When she was stepping down from the Yukon, Mrs. Matherne put her left foot back and connected with the concrete, but when she put her right foot down, only half of her foot made it onto the concrete and she fell.

47. Mrs. Matherne stepped down with one foot, but when she went to step down with her other foot, she started to fall.

48. When she was falling, Mrs. Matherne reached for the railing because she could see it, but then she fell off of the ledge.

49. The Yukon was pulled up far enough that when the door was wide open there was a space, and then the rail on the other side.

50. As Mrs. Matheme was backing out to step out of the Yukon, she appreciated and understood that there was a drop off behind her.

51. Mrs. Matherne does not know why she fell.

52. As she was falling, Mrs. Matherne reached for the rail with her right arm, and landed on her right shoulder and then rolled onto her arm.

53. Mrs. Matherne ended up about half way down the driveway.

54. After the fall, Mrs. Matherne and her husband and the boys and her granddaughter got into the Yukon and went on to the arcade in Gatlinburg.

55. To get back into the Yukon, Mrs. Matherne went to the end of the driveway and back along the upper parking area level and climbed into the Yukon, pulling up into it with her left hand.

56. When Mrs. Matherne went outside of the cabin with her granddaughter before she fell, it was light enough that she could see the black railing.

57. As Mrs. Matherne was walking up the driveway toward the back door to get in the Yukon, at no point did either she or her granddaughter almost fall off the drop off.

58. Mrs. Matherne knew the drop off was there when she was walking toward the back door of the Yukon.

59. Mrs. Matherne knew that if she stepped off of the drop off, she could fall.

60. Mrs. Matherne did not report her fall to the office at any point during her stay.

61. Mrs. Matherne did not report her fall to Patriot Getaways until after she hired her attorney.

62. In her deposition, Mrs. Matherne identified a picture as being either identical or similar to the photograph that she saw when she went on the website for Patriot Getaways that showed the two different levels of parking.

63. Mrs. Matherne booked the vacation rental within about 4-6 weeks of the trip.

64. Somewhere around 4-6 weeks before Mrs. Matherne came to Pigeon Forge for her trip, Mrs. Matherne had seen a photograph of the dual parking levels.

65. Before Mrs. Matherne fell, she knew that the black wrought iron fence did not extend all of the way to the road.

66. Before Mrs. Matherne fell, she knew that there was a drop off of differing heights between the upper and lower parking levels, depending on how close she was to the road.

67. The only reason that Mrs. Matherne is claiming she fell is because the black wrought iron fence did not extend all the way to the road.

68. As Mrs. Matherne was stepping down from the Yukon, and put her second (right) foot down, there was enough room for her to put her right foot down entirely on the concrete when she removed it from the running board of the Yukon.

69. When Mrs. Matherne and her granddaughter left the house and walked down the driveway and up the second level of parking area, she knew there was a risk of falling off of the ledge.

70. Before she fell, Mrs. Matherne had told the children not to go up onto the upper parking area because she knew there was a chance that one of them could fall off and get hurt.

71. Mrs. Matherne knew that as she walked toward the upper parking area there was a risk that if she was not careful, she could fall off the edge.

72. As Mrs. Matherne put her granddaughter into the back seat of the Yukon, she knew that she could fall off the ledge and get hurt.

73. As Mrs. Matherne was getting out of the Yukon, she knew that there was a risk that if she wasn't careful, she could fall off of the ledge and get hurt.

74. There was nothing that prevented either Mrs. Matherne or her husband or any other family member from backing the Yukon out to where it was not beside the ledge between the upper and lower parking levels.

75. Mrs. Matherne made the decision to park the Yukon up on the upper level parking area.

76. As Mrs. Matherne was putting her right foot down stepping out of the Yukon, she was holding the handle in the doorway of the Yukon with her left hand and she was not holding onto anything with her right hand.

77. When Mrs. Matherne stepped down with her left foot, she was looking down, and when she was stepping down with her right foot, she was not looking down, but was looking more toward her right.

78. The light was still on the inside of the Yukon when Mrs. Matherne was stepping down.

79. Nothing about the concrete itself caused Mrs. Matherne to fall.

80. Mrs. Matherne is not claiming that it was wet on the concrete or that any foreign object was present that caused her to fall.

81. Mrs. Matherne is not claiming that any unevenness of the concrete caused her to fall.

82. Mrs. Matherne has no information from any source that leads her to believe that prior to the time that she fell that anyone else had ever fallen in that specific area of the driveway between the parking levels.

83. When Mrs. Matherne opened the door to put her granddaughter in the Yukon, she was paying attention to where the railing stopped relative to where the door was because she did not want to bang the door on the railing.

84. Vicki Matherne was aware of her surroundings when [she] was stepping in and out of the Yukon on December 29, 2011.

85. Rodney Matherne saw his wife fall.

86. When the family arrived at the cabin the night before Mrs. Matherne's fall, Rodney Matherne noticed the upper level parking area.

87. Mr. Matherne noticed that there was a change in elevation from the upper pad to the lower pad.

88. The change in elevation was pretty obvious as you could see the upper level parking area from the front door of the cabin.

89. Before the family arrived at the cabin, Rodney Matherne saw the photograph on the website of the American Patriot Getaways showing the two levels of parking area.

90. Mr. Matherne recalled that he mentioned to his wife that if it snowed or froze then he would not park the vehicles on the upper level parking area because they might slide into the cabin.

91. The next morning after the family arrived at the cabin, Mr. Matherne moved the Yukon up to the upper parking area.

92. Mr. Matherne moved the Yukon up to the upper parking area to make room in the driveway as well as for safety for the kids to discourage them from getting up there.

93. Mr. Matherne knew that Mrs. Matherne was concerned that she did not want the kids to play on the upper pad because it is unsafe and even though the upper area had a handrail it was a long drop.

94. From the time that the family arrived, the drop from one level to the next both where there was a handrail and where there was not a handrail was open and obvious.

95. When Mr. Matherne arrived back from the day trip that he had gone on with the rest of the family to Cades Cove and parked the Yukon in the upper level parking area, he pulled up to where there was enough room to open the front door beside the railings. In particular, he pulled up all the way to the left as far as he could to where he could open his door on the left-hand side of the vehicle and get out because he wanted to intentionally leave enough room on the other side of the vehicle next to the railing to where the door could be opened.

96. When the Yukon was parked in the upper level parking area, there was room to open both right side front passenger and rear passenger doors fully extended without touching the rail.

97. When Mrs. Matherne went out to put her granddaughter in the Yukon, there was approximately 3 — 3 ½ feet from the right side passenger tires to the rail and drop off.

98. When Mr. Matherne got back from the day trip to Cades Cove around 2:00 p.m., after parking the Yukon in the upper parking area, he got out of the Yukon and walked around the back of the Yukon and down the side to get into the house.

99. When Mr. Matherne walked around the back of the Yukon to get back into the house, he stepped off the little drop off between the upper and lower parking areas.

100. When Mrs. Matherne and her granddaughter first went out of the front door to the Yukon, Mr. Matherne was still in the house talking to the boys and getting them ready.

101. Mr. Matherne was standing on the porch when his wife fell.

102. At no time during the week that the Matherne family was staying at the cabin did Mr. Matherne have any issue with backing the Yukon out of the upper parking area where he came close to running off the edge.

103. Mr. Matherne did not observe anybody in his party either before or after his wife fell who almost fell off the edge between the upper and lower parking levels.

104. Mr. Matherne did not personally call anyone at the rental office to let them know what happened.

105. Rodney Matherne has not had any conversations with Jerry West or Carolyn West about his wife's fall.

106. Rodney Matherne has not ever spoken with anyone at American Patriot Getaways about Mrs. Matherne's fall.

107. There was nothing that prevented Mr. or Mrs. Matherne or anyone else in their party from seeing that the black rail did not go down to the street.

108. On December 28, 2011, there was sufficient room for Mrs. Matherne and her granddaughter to walk up to the rear door of the Yukon and get in without falling.

109. On December 28, 2011, there was sufficient room for Mrs. Matherne to be able to get in and out of the back seat of the Yukon without falling.

110. On December 28, 2011, there was sufficient room for someone to get in and out of the front passenger's seat without falling.

***

CONCLUSIONS OF LAW

1. On December 29, 2011, the defendants owed a duty to the plaintiff related to the potential dangerous condition that existed at the rental property known as "Bear House Rock" located at [sic] located at 607 Quill Gordon Court in Pigeon Forge, Tennessee.

2. On December 29, 2011, prior to her fall, plaintiff had absolute and actual knowledge of the potentially dangerous condition related to the dual parking levels at the rental property known as "Bear House Rock" located at [sic] located at 607 Quill Gordon Court in Pigeon Forge, Tennessee.

3. On December 29, 2011, with absolute and actual knowledge of the potentially dangerous condition related to the dual parking levels at the rental property known as "Bear House Rock" located at [sic] located at 607 Quill Gordon Court in Pigeon Forge, Tennessee, plaintiff continued to act in a manner that placed herself in danger.

4. On December 29, 2011, the potentially dangerous condition related to the dual parking levels at the rental property known as "Bear House Rock" located at [sic] located at 607 Quill Gordon Court in Pigeon Forge, Tennessee was open and obvious for the plaintiff and all persons to see, comprehend, and appreciate and that plaintiff had at least equal knowledge of its existence.

-12-

5. On December 29, 2011, the plaintiff knew that the potentially dangerous condition existed. She had seen and appreciated the difference in height between the upper and lower parking levels. She had seen and appreciated the fact that the black fence/handrail/guard rail did not extend all the way to the street. She had told the children in her group not to play on the upper parking level because she knew that someone could fall and get hurt. She had made her husband park the Yukon in the upper parking level so that the other members of her party could not get up there to play because she knew that someone could fall and get hurt due to the difference in height between the parking levels and the lack of a guard rail going all the way to the road. She knew that she could possibly fall and be injured if she was not careful,

6. Based upon all of the undisputed material facts and applying the law of the State of Tennessee, on December 29, 2011, plaintiff was guilty of negligence that was the proximate cause of her fall and any injuries allegedly sustained therefrom.

7. Based on all of the undisputed material facts, the plaintiff, as a matter of law, the Court finds that the plaintiff had the absolute and actual notice of the alleged danger at issue and with such knowledge, the plaintiff continued to act in such a way that placed herself in danger which makes her at least 50% at fault for her fall and any injuries sustained.

8. Based on all of the undisputed material facts, the plaintiff, as a matter of law, given her full knowledge and understanding of the potentially dangerous condition, failed to exercise reasonable care for her own safety and was guilty of negligence that was the proximate cause of her fall and any injuries allegedly sustained therefrom.

9. Based upon all of the undisputed material facts and applying the law of the State of Tennessee, on December 29, 2011, plaintiff was at least 50% at fault for her fall and any injuries sustained therefrom.

10. Under the comparative fault principles adopted by the State of Tennessee, plaintiff, being at least 50% at fault as a matter of law, is barred from recovery in this matter, and as such, plaintiffs' Complaint should be dismissed with full prejudice to the re-filing of the same.

11. Since this matter was filed on or after July 1, 2011, T.C.A. §20-16-101 governs the standard for determining summary judgment.

12. Defendants have submitted evidence that negates one or more essential elements of the plaintiffs' claims and that the plaintiffs' evidence is insufficient to establish an essential element of the plaintiffs' claims. In particular, the plaintiffs have failed to submit any proof that the defendants owed any duty to the plaintiff given the fact that the alleged dangerous condition was open and obvious, that the plaintiff had at least equal

knowledge of its existence, and based upon the Court's finding that plaintiff was at least 50% at fault for her fall and any injuries allegedly sustained therefrom.

Plaintiffs timely filed an appeal to this Court.

## Discussion

We restate and consolidate the issues Plaintiffs raise on appeal into the following dispositive issue: whether the Trial Court erred in granting Defendants' motion for summary judgment.

As our Supreme Court has instructed:

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\* \* \*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a

separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC,* 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

       With regard to negligence, our Supreme Court has explained:

       As we have frequently observed, a negligence claim requires a plaintiff to prove the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *See, e.g., Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). The duty element is a question of law requiring the court to determine "whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id*. at 870 (quoting W. Page Keeton, *Prosser & Keeton on*

*Torts*, § 37 at 236 (5th ed.1984)).  Appellate review of a question of law is de novo.  *Bradshaw*, 854 S.W.2d at 870.

In analyzing duty, the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm.  *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 902 (Tenn. 1996).  A "risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm."  *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

In a premises liability case, an owner or occupier of premises has a duty to exercise reasonable care with regard to social guests or business invitees on the premises.  The duty includes the responsibility to remove or warn against latent or hidden dangerous conditions on the premises of which one was aware or should have been aware through the exercise of reasonable diligence.  *See Blair v. Campbell*, 924 S.W.2d 75, 76 (Tenn. 1996); *Eaton v. McLain*, 891 S.W.2d 587, 593–94 (Tenn. 1994).  Although the traditional rationale for imposing this duty was the owner's superior knowledge of conditions on the premises, *see e.g., Kendall Oil v. Payne*, 41 Tenn. App. 201, 293 S.W.2d 40, 42 (Tenn. App. 1955), we recently held that a duty may exist even where the injury-causing condition is alleged to be "open and obvious" to the plaintiff.  We explained:

> That a danger to the plaintiff was 'open or obvious' does not, *ipso facto*, relieve a defendant of a duty of care.  Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm.  The factors provided in the Restatement (Second) of Torts, § 343(A) relate directly to the foreseeability question; in short, if the foreseeability and gravity of harm posed from a defendant's conduct, even if 'open and obvious,' outweighed the burden on the defendant to engage in alternative conduct to avoid the harm, there is a duty to act with reasonable care.

*Coln v. City of Savannah*, 966 S.W.2d 34, 43 (Tenn. 1998).

The duty imposed on the premises owner or occupier, however, does not include the responsibility to remove or warn against "conditions from which no unreasonable risk was to be anticipated, or from those which the occupier neither knew about nor could have discovered with reasonable care." *Prosser and Keeton on Torts*, supra, § 61 at 426. In this regard, "the mere existence of a defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it." *Id*. at 426–27. As we explained in *Doe v. Linder Const. Co*., 845 S.W.2d 173, 178 (Tenn. 1992):

> Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability. '[T]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, *and that some action within the [defendant's] power more probably than not would have prevented the injury*.'

(emphasis added) (citations omitted).

*Rice v. Sabir*, 979 S.W.2d 305, 308-09 (Tenn. 1998) (footnote omitted).

> As explained in *Staples v. CBL & Assocs.*, Inc.:

> In negligence cases, only after the element of duty is established does the comparative fault of the plaintiff come into play. *See Coln v. City of Savannah*, 966 S.W.2d [34] at 42 [ (Tenn. 1998) ]. If the defendant has plead the affirmative defense of the plaintiff's relative fault, the reasonableness of the plaintiff's conduct in confronting a risk should be determined under the principles of comparative fault. *See Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994). If the evidence is evaluated in the light most favorable to the plaintiff and reasonable minds could not differ that her fault was equal to or great [sic] than that of the defendants, summary judgment in the defendant's favor may be granted. *See Coln v. City of Savannah*, 966 S.W.2d at 44.

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91-92 (Tenn. 2000).

Defendants cite *Goumas v. Mayse*, No. 2013-01555-COA-R3-CV, 2014 WL 1713195 (Tenn. Ct. App. April 29, 2014), *no appl. perm. appeal filed*, for the proposition that an individual has a responsibility to tend to his or her own safety. In *Goumas*, we stated:

> There are no disputed material facts presented in this record; plaintiff does not argue in his brief that there are any, nor does he point to any material fact in dispute. Accepting plaintiff's version of the facts as true, and drawing all reasonable inferences in his favor, we find that there is no proof establishing that the area where plaintiff "misstepped" and fell presented any unreasonable risk of harm. There is simply no evidence of a dangerous or defective condition. The rock that plaintiff tripped on was easily visible, in an area with no obstructions; it was truly "open and obvious." Plaintiff was well familiar with the area, having worked there and traveled the same path on three earlier occasions. Plaintiff admitted having seen the rock and stepped on it multiple times before his misstep, so he knew the rock was there. " 'Liability in premises liability cases stems from superior knowledge of the condition of the premises.' " *Blair v. W. Town Mall*, 130 S.W.3d at 764 (quoting *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980)); *Christian v. Ayers L.P.*, No. E2013-00401-COA-R3-CV, 2014 WL 1267247 at *5 (Tenn. Ct. App. E.S., filed Mar. 28, 2014) (quoting *Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012)); *Martin v. Melton*, No. M2012-01500-COA-R3-CV, 2013 WL 6206865 at *5 (Tenn. Ct. App. M.S., filed Nov. 26, 2013); *Nee*, 106 S.W.3d at 653. Under these circumstances, plaintiff had at least equal, and probably superior, knowledge of the condition of the premises at issue. Even assuming that defendants had constructive notice of the location of the rock, there is no evidence that they undertook any action to put it there or to create any condition that could be said to be unreasonably dangerous.
>
> Several other legal principles inform our analysis and decision. We have recently noted that "an individual has a duty to take reasonable care for his or her own safety." *Martin*, 2013 WL 6206865 at *4; *see also Green*, 398 S.W.3d at 179; *Smid v. St. Thomas Hosp.*, 883 S.W.2d 632, 634 (Tenn. Ct. App. 1994) ("We doubt that there is any product of nature or of human invention, no matter how benevolent, that a human being cannot turn into a source of injury to himself, if only he is careless enough. We believe that the defendant had no duty to protect the plaintiff from the consequences of his action, when he could have easily protected himself by

simply looking where he was about to step."). We have also observed that " 'negligence is not to be presumed by the mere happening of an injury or accident,' " *Friedenstab v. Short*, 174 S.W.3d 217, 219 (Tenn. Ct. App. 2004) (quoting *Brackman v. Adrian*, 472 S.W.2d 735, 739 (Tenn. Ct. App. 1971)), and that "[a] landowner is not an insurer of his premises as relates to invitees." *Id*. at 224 (citing *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980)). Finally, Tennessee appellate courts have affirmed summary judgment or a directed verdict on numerous occasions on the ground that there was no duty under facts similar or analogous to those presented here. *See, e.g., Green*, 398 S.W.3d at 179-80, 182, and cases cited therein; *Friedenstab*, 174 S.W.3d at 228; *Wilson v. Gables-Tenn. Properties, LLC*, 168 S.W.3d 154, 155 (Tenn. Ct. App. 2004); *Plunk v. Nat'l Health Investors, Inc.*, 92 S.W.3d 409, 415 (Tenn. Ct. App. 2002) (reversing jury verdict and directing dismissal of premises liability claim); *Nee*, 106 S.W.3d at 654; *Rice*, 979 S.W.2d at 307.

*Goumas*, 2014 WL 1713195, at **8-9.

In other premises liability cases, however, this Court has determined that summary judgment was inappropriate. In *Reynolds v. Rich*, No. E2015-01245-COA-R3-CV, 2016 WL 4007883 (Tenn. Ct. App. July 22, 2016 ), *Rule 11 appl. perm. appeal filed Sept. 20, 2016*, we stated:

Defendants argue in their brief on appeal that they did not owe a duty to Plaintiff "inasmuch as every volunteer present at the construction site possessed a duty to exercise reasonable care to avoid injury to another." While we agree that the volunteers had a duty to exercise reasonable care to avoid injury to themselves and each other, this in no way means that defendants did not owe a duty to Plaintiff.

In the case now before us, it is clear that the reasonably foreseeable probability and gravity of harm from a possible fall while installing a roof outweighs the burden upon defendants to engage in alternative conduct which would prevent such a risk of harm. Thus, defendants' use of volunteers to install the roof gave rise to a duty for defendants to act with reasonable care. We, therefore, hold that defendants did owe a duty to Plaintiff.

Turning to the issue of whether the duty that defendants owed to Plaintiff was breached, and viewing the evidence in the light most favorable to Plaintiff, as we must at this summary judgment stage of the proceedings,

we note that there are genuine disputed issues of material fact regarding whether defendants breached the duty they owed to Plaintiff. There are genuine disputed issues regarding whether defendants could have, or should have, taken action other than, or in addition to, what was done, such as providing a safety or restraining device which would have prevented the risk of a fall from the roof.

***

Viewing the evidence in the light most favorable to plaintiffs, again as we must at this summary judgment stage, we cannot say that a rational trier of fact could not find that the percentage of fault attributable to Plaintiff was less than 50%. As such, there are genuine disputed issues of material fact with regard to comparative fault in this case, making summary judgment inappropriate.

As there are genuine disputed issues of material fact with regard to whether defendants breached the duty they owed to Plaintiff and genuine disputed issues of material fact as to comparative fault, summary judgment was granted improperly. We, therefore, reverse the grant of summary judgment and remand this case to the Trial Court for further proceedings consistent with this Opinion.

*Reynolds*, 2016 WL 4007883, at **7-8.

Initially, we observe that it is clear from the record on appeal that Mrs. Matherne knew beforehand about the risk of possibly falling from the elevated parking level. Mrs. Matherne had seen the dropoff. Mrs. Matherne even had forbidden the children from playing on the upper parking level. We are satisfied that Mrs. Matherne's actual knowledge of the danger is not in dispute here. Mrs. Matherne knew the risk. According to Defendants, this should be sufficient to grant their motion for summary judgment.

However, Mrs. Matherne's knowledge of the risk does not end our inquiry. In the case law cited above, even an "open and obvious" hazard does not necessarily relieve a defendant of a duty of care. We must determine whether the reasonably foreseeable probability and gravity of harm from a possible fall while using the upper parking level as intended outweighed the burden upon Defendants to engage in alternative conduct which would have prevented a risk of harm to Plaintiffs. In our judgment, *Reynolds* is more persuasive and applicable to the facts of this case than *Goumas*. In *Reynolds*, it could well be said that the danger of falling off a roof should be

-20-

obvious to anyone. That did not serve to relieve defendants in that case of a duty of care. Similarly, in the present case, the danger of falling off this elevated parking level was obvious to Mrs. Matherne. We conclude, nevertheless, that Defendants owed a duty of care. In a way, Defendants' protestations that Mrs. Matherne knew of the obvious risk argues too much. This is tantamount to conceding that there was an obvious danger to guests on this property because the railing did not extend to the end of the elevated parking area. Tennessee case law does not automatically insulate a premises owner from a duty of care or liability simply because the danger was open and obvious.

Having determined that Defendants owed a duty of care, we must consider whether, at this summary judgment stage, there is a genuine issue as to whether Defendants breached their duty of care to Plaintiffs. Defendants argue that Plaintiffs failed to adequately submit evidence that any additional precautions, such as extending the safety railing, were feasible. Plaintiffs did not submit any kind of detailed evidence regarding the feasibility of precautions such as extended railing. In her deposition, Mrs. Matherne was asked by Defendants' counsel what Defendants could have done to avert a risk of falling, and she provided various answers including extending the railing. It is true that it would have been better had Plaintiffs presented additional evidence in opposition to Defendants' motion for summary judgment demonstrating that Defendants feasibly could have taken additional precautions such as extending the railing. However, we do not believe that, under this record, Plaintiffs' failure to do so fatally undermines their case at this summary judgment stage. The risk of an individual incurring serious injury or even death by falling from the upper parking level to the lower parking level and landing on concrete outweighs the burden on the Defendants to prevent the risk of harm by alternative conduct of the Defendants such as extending the railing along the full length of the sides of the upper parking level. For example, photographs in the record of the parking areas clearly show that the railing went around a significant portion of the upper parking level including portions of both sides. The photos show that the railing stopped several feet short of the end of the elevated parking level even though the drop off still was, according to Mrs. Matherne in her deposition, "[a]t least two feet" where she fell. Taking the evidence in the light most favorable to Plaintiffs, as we must at this summary judgment stage, it would have been feasible for the Defendants to extend the railing a few more feet for the entire length of the upper parking level. At this summary judgment stage, it is at least a disputed fact whether Mrs. Matherne could have fallen to the lower parking level if the railing had been extended all along the sides of the upper parking level. The foreseeable probability and gravity of harm to an individual falling from the upper parking level to the lower parking level onto concrete outweighs the burden upon the Defendants to extend for a few more feet the railing already placed along most of both sides of the upper parking level.

Viewing the evidence in the light most favorable to Plaintiffs, as we must at this summary judgment stage of the proceedings, we note that there are genuine disputed issues of material fact regarding whether defendants breached the duty they owed to Plaintiffs. There are genuine disputed issues regarding whether Defendants could have, or should have, taken action other than, or in addition to, what was done, such as extending the safety railing to include all of both sides of the upper parking level.

There seems little doubt that Defendants, had they chosen to do so, could have engaged in alternative conduct by extending the railing a few more feet for the full length of the upper parking level and that this would have prevented the harm to Mrs. Matherne. Could a rational trier of fact find that Mrs. Matherne was 50% or more at fault? Clearly the answer is yes. However, viewing the evidence in the light most favorable to Plaintiffs, again as we must at this summary judgment stage, we cannot say that a rational trier of fact could not find that the percentage of fault attributable to Mrs. Matherne was less than 50%. As such, there are genuine disputed issues of material fact with regard to comparative fault in this case, making summary judgment inappropriate.

As there are genuine disputed issues of material fact with regard to whether Defendants breached the duty they owed to Plaintiffs and as to comparative fault, summary judgment was granted improperly. We, therefore, reverse the grant of summary judgment and remand this case to the Trial Court for further proceedings consistent with this Opinion.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings consistent with this opinion. The costs on appeal are assessed against the Appellees, Jerry West, Carolyn West, and American Patriot Getaways.

_____
D. MICHAEL SWINEY, CHIEF JUDGE