# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 20, 2024 Session

## DANIELLE LOWE, EX REL. BEAU CHRISTOPHER LOWE ET AL. v. BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC

**Appeal from the Circuit Court for Warren County**
**No. 21-CV-1401    Larry B. Stanley, Jr., Judge**

_____

### No. M2023-01774-COA-R3-CV

_____

This is a premises liability/wrongful death case. Decedent, an employee of appellee's independent contractor, died when the suspension system that was used to lift and turn tire molds failed, and the mold fell onto decedent. The trial court denied appellee's motion for summary judgment on the question of workers' compensation exclusivity, but it granted appellee's motion for summary judgment on the question of duty. Because disputed material facts concerning appellee's duty to decedent preclude summary judgment, we reverse the trial court's grant of the motion on that question. We affirm the trial court's denial of summary judgment on the workers' compensation exclusivity question.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court, Affirmed in Part; Reversed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

D. Andrew Saulters, Nashville, Tennessee, and C. Brent Keeton, Manchester, Tennessee, for the appellants, Danielle Lowe, H.L., and K.L.[1]

J. Isaac Sanders and Benjamin C. Aaron, Nashville, Tennessee, for the appellee, Bridgestone Americas Tire Operations, LLC.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the children's names to protect their identities.

# OPINION

## I. Background

On June 8, 2020, Beau Christopher Lowe ("Decedent") was killed while working at the Warren County plant of Appellee Bridgestone Americas Tire Operations, LLC ("Bridgestone," or "BATO"). At the time, Decedent was employed as a millwright by Cumberland Machine Company, Inc. ("Cumberland"). Although Cumberland and Bridgestone are separate entities, Cumberland has dedicated space inside the Bridgestone plant. Decedent's widow is Appellant Danielle Lowe; she and Decedent are the parents of two minor children, H.L. and K.L.

Decedent died when a 2200-pound tire mold (a large, round, steel plate), which was suspended in the air by two straps and two bolts, fell onto him. The mold's vent holes were clogged with rubber, and the mold was brought to Cumberland's mold-repair shop (within the Bridgestone facility) so that Decedent could clear the vent holes. This process required Decedent to insert bolts (one inch in circumference and eight inches in length) into the insertion holes on the outside of the mold plate. Straps from the overhead crane could then be applied to those bolts for the lifting and flipping (rotating) of the mold to allow Decedent access to both sides to clean the vent holes. Decedent had a worktable so that the mold could be placed on the table for him to use the necessary tools to clean the vent holes; however, he would have to apply the straps and lift the mold via the overhead crane to suspend the mold high enough to clear the worktable to be able to flip it and then lower it back onto the table to clear the vent holes on the other side. Decedent had been working on the mold for approximately one hour and had flipped the mold a couple of times when the female portion where one of the load bolts was inserted came out of the mold, causing the mold to fall to the worktable below. The mold then hit the floor and ultimately landed on Decedent. The mold, which was extremely hot from its recent cleaning, covered Decedent from his thigh to his chest. Decedent was transported to the hospital, where he later died from his injuries.

On May 4, 2021, Mrs. Lowe, individually and on behalf of the minor children, filed her original complaint (which was later amended to add a claim for negligence per se) against Bridgestone. In its answer, Bridgestone asserted that it was immune from suit based on workers' compensation exclusivity, Tennessee Code Annotated section 50-6-108. Bridgestone also asserted that it owed Decedent no duty of care. In response to Bridgestone's answer, Mrs. Lowe filed a motion for summary judgment on the question of workers' compensation exclusivity. Bridgestone filed a response in opposition to the motion for summary judgment and a cross-motion for summary judgment on the same question. The cross-motions were heard on May 31, 2023. On its finding that there were disputes of material fact, *see discussion infra*, the trial court denied the cross-motions by order of June 2, 2023.

On August 4, 2023, Bridgestone filed a second motion for summary judgment on the question of duty. Mrs. Lowe opposed the motion, which was heard on November 14, 2023. By order of November 30, 2023, the trial court granted Bridgestone's motion for summary judgment on its finding that Bridgestone owed Decedent no duty of care. Appellant appeals.

## II. Issues

Appellant raises the following issues, as stated in her brief:

1. Whether the trial court erred in finding that Bridgestone did not owe a duty of care pursuant to **Blair v. Campbell**, 924 S.W. 2d 75 (Tenn. 1996)?
2. Whether Bridgestone assumed a duty by failing to fully relinquish control of its premises?
3. Whether Bridgestone assumed a duty, based upon its own contract with Cumberland?
4. Whether, by maintaining safety superiority, Bridgestone owed a duty of care to the employee of its independent contractor?
5. Whether the issue of foreseeability places a duty upon Bridgestone?
6. Whether the trial court correctly found genuine issues of disputed material fact exist regarding the issue of workers' compensation exclusivity?
7. Whether the trial court erred in conflating Bridgestone's control of its premises as opposed to control of the worker?
8. Whether the trial court correctly found issues of disputed fact regarding whether Mr. Lowe was engaging in the same type of work usually performed by Bridgestone and whether that work was part of the regular business of Bridgestone?

## III. Standard of Review

A trial court's decision to grant a motion for summary judgment presents a question of law. Therefore, our review is de novo with no presumption of correctness afforded to the trial court's determination. **Bain v. Wells**, 936 S.W. 2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that all requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. **Green v. Green**, 293 S.W.3d 493, 514 (Tenn. 2009). When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. For summary-judgment purposes, a disputed fact is "material" if it must be decided in order to resolve the substantive claim or defense at which the motion is directed. **Id.** The Tennessee Supreme Court has explained that when the party moving for summary judgment does not bear the burden of proof at trial, "the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim, or (2) by

demonstrating that the nonmoving party's evidence at the summary-judgment stage is insufficient to establish the nonmoving party's claim or defense." ***Rye v. Women's Care Center of Memphis, MPLLC***, 477 S.W.3d 235, 264 (Tenn. 2015) (italics omitted). Furthermore,

> "[w]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita Elec. Indus. Co.,*** [***Ltd. v. Zenith Radio Corp.***], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

***Rye***, 477 S.W.3d at 265.

## IV. Duty

In a cause of action for negligence, the plaintiff must establish five elements: (1) a duty of care owed by the defendant to the plaintiff; (2) breach by the defendant of that duty of care; (3) injury or loss; (4) cause in fact; and (5) proximate or legal cause. ***Hale v. Ostrow***, 166 S.W.3d 713, 716 (Tenn. 2005); ***Bradshaw v. Daniel***, 854 S.W.2d 865, 869 (Tenn. 1993). Duty is the legal obligation a defendant owes to a plaintiff to conform to the reasonable person standard of care in order to protect against unreasonable risks of harm. ***Cullum v. McCool***, 432 S.W.3d 829, 833 (Tenn. 2013); ***Satterfield v. Breeding Insulation Co.***, 266 S.W.3d 347, 355 (Tenn. 2008); ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995). Whether a defendant owed or assumed a duty of care to a particular plaintiff is a question of law. ***Downs ex rel. Downs v. Bush***, 263 S.W.3d 812, 819-20 (Tenn. 2008); ***Blair v. Campbell***, 924 S.W.2d 75, 78 (Tenn. 1996); ***Bradshaw***, 854 S.W.2d at 869. Persons seeking to prevail against a property owner on a premises liability claim must prove the elements of a negligence claim, *supra*; in addition, he or she must prove either that the condition (1) was caused or created by the owner, operator, or his agent; or (2) if the condition was created by someone other than the owner, operator, or his agent, there must be actual or constructive notice on the part of the owner or operator that the condition existed prior to the accident. ***Parker v. Holiday Hosp. Franchising, Inc.***, 446 S.W.3d 341, 350 (Tenn. 2014) (citing ***Blair v. West Town Mall***, 130 S.W.3d 761, 764 (Tenn. 2004)); ***Ogle v. Winn-Dixie Greenville, Inc.***, 919 S.W.2d 45, 47 (Tenn. App. 1995); ***Jones v. Zayre, Inc.***, 600 S.W.2d 730, 732 (Tenn. App. 1980).

Here, Appellant claims that Decedent (and other Cumberland employees) were required to follow Bridgestone's mandated process for lifting and flipping tire molds, and that there were flaws in that process. Appellant claims that the accident was foreseeable in view of the flawed rigging and argues that Bridgestone could have implemented procedures to prevent such accidents in Cumberland's repair shop. Indeed, as discussed below, Bridgestone had implemented a different procedure called a "D-ring capture" system for lifting and turning molds in most areas of its Warren County plant. For reasons unknown, the "D-ring capture" system was not implemented in Cumberland's shop. In their respective depositions, Dan Shipley, a Bridgestone engineer and member of the Safety Committee, and David Holcomb, an Engineering Technician in Bridgestone's Maintenance Department and the Safety Committee representative for his department, opined that if the "D-ring capture" system had been in place in Cumberland's shop, then Decedent's accident would have been prevented. Thus, Appellant maintains that Bridgestone owed a duty of care to Decedent. Bridgestone asserts that it owed Decedent no duty and relies on the contractor exception established by the Tennessee Supreme Court in *Blair v. Campbell*, 924 S.W. 2d 75 (Tenn. 1996). The trial court also relied on *Blair* in granting Appellee's motion for summary judgment. Specifically, the trial court's order granting summary judgment on the question of duty states:

> It is undisputed that: 1) Beau Christopher Lowe was an employee of Cumberland Machine which was an independent contractor of Bridgestone Americas Tire Operations, LLC ("BATO"), 2) Lowe was hired, trained and supervised by Cumberland, 3) Cumberland was engaged in the business of repairing molds for BATO, 4) The defects in the mold plate that was being repaired for BATO caused or contributed to the accident that is the gravamen of this action.
>
> It is established law in Tennessee that a landowner generally owes a duty to provide a reasonably safe place in which to work to an independent contractor. However, in 1996 The Tennessee Supreme Court established an exception to this rule by ruling that no duty of care is owed by the landowner where the risks "arise from, or are immediately connected with, defects of the premises or of machinery or appliances located thereon which the contractor has undertaken to repair." *Blair*[, 924 S.W.2d at 76-77].
>
> The Court finds therefore that since Mr. Lowe was killed while performing work as an independent contractor while working at a facility owned by BATO, and the work being performed was repair work, and the accident was intimately connected with the defect in the machinery and appliance, that the *Blair* exception to the general premises liability rule applies.

The Tennessee Supreme Court decided *Blair* four years after Tennessee abrogated the doctrine of contributory negligence in favor of the modified comparative fault scheme adopted in *McIntyre v. Ballentine*, 833 S.W. 2d. 52 (Tenn. 1992). As Justice Holder

explained in her separate concurrence in **Satterfield**, the **Blair** Court held "that property owners owe no duty to protect a contractor from a property defect that the contractor has undertaken to repair." **Satterfield**, 266 S.W.3d. at 378 (Holder, J. concurring in part). Here, the "defect that [Decedent] under[took] to repair" was clogged vent holes in the mold itself. From our review, there is dispute as to whether Decedent's accident resulted from flaws in the tire mold, *i.e.*, the subject of Decedent's work, or from flaws in Bridgestone's mandated process for lifting and turning those molds. In summary, it could be argued that Decedent was killed by a defect in Bridgestone's ancillary equipment and/or its dangerous and unsafe mandatory procedure for lifting and turning the mold, and not by a defect in the actual mold Decedent was contracted to repair. Although subtle, this distinction is important because, if Decedent's injury was caused by the flawed rigging, the **Blair** exception would not apply.

Turning to the question of whether Bridgestone owed Decedent a duty of care, even before **Blair**, Tennessee courts addressed the question of a premises owner's duty to an independent contractor working on its premises. For example, in **Shell Oil v. Blanks**, a case cited by the **Blair** Court, a contractor, who was hired to paint a steel light pole on gas station premises, filed suit after the pole collapsed and caused his ladder to fall. In **Shell Oil**, we held that

> "[a] person who is having work done on his premises by an independent contractor, and has actual or constructive knowledge of latent or potential dangers on the premises, owes a duty to give warning of, or use ordinary care to furnish protection against such dangers to employees of the contractor or subcontractors who are without actual or constructive notice of the dangers."

**Shell Oil v. Blanks**, 330 S.W.2d 569, 574 (Tenn. Ct. App. 1959), *perm. app. denied* (Tenn. July 27, 1959) (quoting 57 C.J.S. Master and Servant § 606, p. 377). "This rule is based on the presumption that an owner or occupier of land has, by virtue of his control and maintenance of the premises, superior knowledge of dangerous conditions on the premises." **Walker v. Robertshaw Controls Co.**, No. 1158, 1988 WL 125820, at *2 (Tenn. Ct. App. Nov. 28, 1988) (citing **Odum v. Haynes**, 494 S.W.2d 795, 800 (Tenn. App. 1972); **Illinois Central Railroad Company v. Nichols**, 118 S.W.2d 213, 217-18 (Tenn. 1938)).

In addition to the foregoing, the case of **Miranda v. CSC Sugar, LLC**, No. W2017-01986-COA-R3-CV, 2018 WL 3302035 (Tenn. Ct. App. July 5, 2018), is instructive. In **Miranda**, appellant, an independent contractor's employee, was using an electric screw gun powered by a one-hundred-foot extension cord to install a second layer of sheetrock on an interior wall of appellee/defendant's plant. *Id.* at *1. According to appellant, the use of the extension cord was necessary because the only source of electricity was in a different part of the warehouse. *Id.* It is undisputed that appellant ran the extension cord across a doorway to access a working outlet. While appellant was installing sheetrock, appellee's employees were moving product through the doorway with a forklift. *Id.* One of appellee's employees drove a forklift, in reverse, through the doorway and allegedly saw neither the

extension cord, nor the appellant on the scaffolding. *Id.* The extension cord became entangled in the forklift, pulling on the scaffolding and causing appellant to fall approximately ten feet to the concrete below. *Id.* Appellant filed suit asserting that appellee had a duty to maintain its premises in a reasonably safe condition, which it failed to do. Specifically, appellant's complaint alleged that appellee: (1) failed to properly maintain the premises under its care; (2) failed to properly inspect the premises under its care for dangerous conditions; and (3) failed to place warning signs at appropriate locations to warn of the dangerous condition of the premises under its care. *Id.* Appellee moved for summary judgment, arguing that it had no duty to warn appellant of the allegedly dangerous condition that appellant created and controlled. *Id.* The trial court granted appellee's motion for summary judgment, and this Court reversed because there were disputed material facts regarding, *inter alia*, whether appellee failed to properly maintain its premises, and whether appellee failed to properly inspect the premises. Specifically, we held that

> the facts presented here create a dispute as to whether appellant [was] in control of the environment in which [he was] working. Although appellant . . . placed the extension cord on the floor in the doorway, [he] had no control over appellee's equipment or employees, who drove the forklift through the doorway and over the cord in the vicinity of appellant's work area.

*Id.* at *4. As succinctly stated in *Johnson v. EMPE, Inc*., a case cited with approval by the *Miranda* Court, the question is: who controls the premises, to-wit:

> If [] the contractor had complete control of the premises where the accident occurred and the owner had retained no control of that part of the premises except to the extent of determining if the work was being performed according to the contract, then the owner owes no duty of care to the employees of the contractor.
> The rule may be more concisely stated. The law places the duty upon the person in control of premises to exercise reasonable and ordinary care, under the circumstances, not to cause injury to one lawfully upon the premises. *See Ruth v. Ruth*, 213 Tenn. 82, 372 S.W.2d 285 (1963).

*Johnson v. EMPE, Inc.*, 837 S.W.2d 62, 65 (Tenn. Ct. App. 1992) (citing T.P.I.—CIVIL 9.06 Duty to Workers—Control, Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 9.06 (2d ed.)).

From our review, there are disputes of material fact that preclude summary judgment in this case. These disputed facts go directly to the questions of: (1) whether Bridgestone retained control of the premises, *Johnson*, 837 S.W.2d at 65 ("the duty [is] upon the person in control of premises to exercise reasonable and ordinary care, under the circumstances"); and (2) whether the accident was foreseeable, *Miranda*, 2018 WL 3302035, at *5 ("the pertinent consideration is whether the foreseeability and gravity of

harm posed by [defendant's] conduct, even if 'open and obvious,' outweigh the burden of [defendant] to engage in alternative conduct. If so, the defendant has a duty to act with reasonable care and comparative fault principles apply."). Indeed, in its June 2, 2023 order denying Appellee's motion for summary judgment on the question of workers' compensation exclusivity, the trial court acknowledged certain disputes of material fact, to-wit:

> As to the Motion for Summary Judgment, the Court finds that there are several material facts that are disputed. Most importantly, the Court finds that the facts relating to whether BATO had the right to control any of the work conducted by the Plaintiff are disputed by the facts included in these motions. Similarly, the issue of whether or not the work done by Cumberland was a regular part of BATO's business is factually disputed by the testimony presented by both parties.

In the order granting Appellee's motion for summary judgment on the question of duty, the trial court did not indicate that the disputes of material fact outlined in its earlier order were resolved by further discovery. Our review reveals that they were not.

We begin with the contract between Cumberland and Bridgestone. Although the entire document is not included in the record, the following portion of the contract was set out in Appellant's response in opposition to Bridgestone's second motion for summary judgment on the question of duty:

> 16. BUYER'S [*i.e.*, Bridgestone's] PREMISES. If any vendor [*i.e.*, Cumberland], its employees, subcontractors and agents, should enter buyer's premises in connection with the deliverables in connection with the Deliverables or Services, **they shall comply with Buyer's safety rules and regulations** and security requirements, including participating in Buyer's required training and instructional activities and complying with all environmental management systems and requirements, that are provided to Vendor. Vendor will cooperate with Buyer in the administration of such rules . . . .

(Emphasis added). In its response to Appellant's statement of undisputed material facts, Bridgestone stated:

> 7. Cumberland employees have to follow BATO's procedures on BATO's premises because it is BATO's property.
>
> RESPONSE: Undisputed for purposes of this motion that BATO had the ability to institute procedures on BATO's premises, including the Warren Plant where Mr. Lowe was working, and that Cumberland was expected to

- 8 -

follow such procedures. However, it is denied that BATO directed or dictated how Cumberland employees were to perform the work that was assigned in every respect, or even most respects. . . .

Although there is dispute concerning the extent of Bridgestone's control over the safety procedures in Cumberland's shop, there is no dispute that Bridgestone retained some control over those procedures. Mr. Holcomb testified that Bridgestone could implement safety measures and require Cumberland to use those measures. For example, concerning metal sleeves that were used in the lifting process in the Cumberland shop, Mr. Holcomb stated:

Q. Okay. And use of the metal sleeves, Cumberland had been doing it that way in plain view for years?
A. Years.
Q. If Bridgestone believed that the steel sleeves were a safety issue, they could have implemented a policy or procedure to have prevented Cumberland from using them?
A. Correct.

Likewise, Mr. Shipley testified:

Q. But as I understand it, Bridgestone did not supervise Beau's work; Cumberland did that?
A. Correct.
Q. But, certainly, Bridgestone required its contractors to follow certain safety protocols?
A. Correct.
Q. And that's insisted upon by Bridgestone?
A. Correct.
Q. And that's supervised by Bridgestone that its contractors are following Bridgestone safety standards?
A. Correct.

Mark Browning, Bridgestone's project crew leader, testified:

Q. I mean, BATO requires its contractors such as Cumberland to follow safety protocols—
A. (Interposing) Yes.
Q. –that's insisted on by Bridgestone; correct?
A. Yes.
Q. Okay. So the contractor such as Cumberland has to follow those protocols, but I guess the day-to-day activities for Cumberland and Beau Lowe, those are not controlled by BATO. Those are controlled and supervised by

Cumberland; is that fair?

A. Yes.

***

Q. And, again, that was a BATO process where [Decedent] was lifting the mold 5 to 6 feet high from the ground; correct?

A. That's how we did it in the plant, yes.

Q. That's how BATO did it; correct?

A. That's how we did it.

Q. "We" being BATO.

A. Yes.

Q. Okay.

In addition to having authority to dictate certain procedures for use in the various shops within the Bridgestone facility, Mr. Holcomb also testified that the individual parts of the lifting mechanism used by Decedent were all provided by Bridgestone:

Q. The bolts that were used to insert into the mold to lift it, those were owned by Bridgestone?

A. Correct.

Q. The lifting straps that were used, those were owned by Bridgestone?

A. Correct.

Q. The overhead crane used for lifting was owned by Bridgestone?

A. Correct.

Q. The Ingersoll Rand impact wrench used to tighten the bolts, that was owned by Bridgestone?

A. I believe so.

Q. Everything that's in that setup that Beau was using to work on BATO's mold to repair was owned by BATO?

A. I believe so, yes.

Q. And obviously on BATO's premises?

A. Yes.

Q. With BATO having oversight of all of its contractors for safety and loss prevention?

A. Correct.

Q. Cumberland, in this instance then, they were just supplying skilled labor?

A. Yes.

Cory Balthrop, Bridgestone's Health, Safety and Security Manager, testified:

Q. Okay. What is your understanding of the process in the mold repair shop that Beau Lowe was doing . . . .

A. So basically . . . Beau was performing the mold repair, so his . . . process

- 10 -

would be to take the plates, clear out the vent holes, and do other things to ensure that the plates were ready for use to go back into the curing presses.

Q. Okay. The crane that was used, . . . was that Bridgestone's crane?

A. Correct.

Q. The straps that were used, were those Bridgestone's straps?

A. Correct.

Q. The bolts that were used for the straps to go under the mold, were those Bridgestone bolts?

A. To my knowledge, I believe that's correct.

Q. Okay. The mold that Beau Lowe was repairing, was that a Bridgestone mold?

A. Yes.

***

Q. Okay. The flipping of the mold to repair it, was that a BATO process?

A. It's my understanding that it was done in the past by BATO employees and that there was a working standard written at that time.

Q. Okay. That was a BATO written standard on how to flip the mold to repair it?

A. That's my understanding, yes.

From the foregoing, there is dispute as to whether, or to what extent, Bridgestone controlled the lifting mechanism used by Decedent.

Furthermore, there is indication that Bridgestone undertook safety inspections/audits of other shops, but did not inspect Cumberland's shop. In relevant part, Mr. Balthrop testified:

Q. Okay. You don't disagree with the things we've been over where David Holcomb and Dan Shipley identified several gaps in the BATO process as a cause of this incident with Beau Lowe?

***

A. No. I think, yeah, there are definitely gaps and improvements that I wish we would have made and have—did after the incident.

Q. You would agree with me that if the mold repair had been audited—or the mold repair process had been audited before June of 2020, BATO could have required [a different mold lifting and turning procedure] . . . .

***

- 11 -

A. I would say if I had visibly witnessed the raising of the mold above the table to flip it, that would have been an immediate concern and looking at the angle that was used to lift, I would have said, "Let's look at a spreader bar application to reduce that torque, as you put it."

Q. And seeing how high that the mold was being lifted, I mean, that's as easy as just walking by and sticking your head in and seeing it; correct?

A. Yeah. It's a two-million square-foot facility, and they're not always lifting them . . . so depending on where I'm at in the day, it's very feasible that—and in this case, it happened where I wasn't—I never visibly witnessed the process.

Q. Nothing would have prevented you from scheduling an hour out of a day before June of 2020 and just say, "Hey, when you-all are lifting a mold, let me see how you-all do it."

A. Sure, nothing would have prevented that, absolutely.

***

Q. Well, in over two and a half years that you worked there, you were head of [auditing].

A. And part of the contractor, you know, assessments and site visits, that would occur too.

Q. But mold repair was—to your knowledge, at least at your tenure, safety in the mold repair shop was never audited. . . . So here's what I'm getting at: The choice not to audit the mold repair, was that a knowing choice not to audit the safety of mold repair, or was it just an indifference about the mold repair shop?

A. It wasn't a knowing choice not to audit it. Again, we didn't necessarily audit processes. . . .

Q. And you would agree that in mold repair, contractors like Beau Lowe were working under heavy molds that were suspended in the air as high as 6 feet off the ground; correct?

A. Yes, in this situation, that is the case.

***

Q. Yet mold repair was never looked at by you as head of Safety Department of BATO; correct?

A. Correct, as far as the [lifting] process itself.

Indeed, the record indicates that the safer "D-ring capture" system for lifting and turning the heavy tire molds had been implemented in other areas of the Warren County plant. As Mr. Holcomb testified:

Q. Does BATO use or did it use a D-ring capture system in other parts of the plant or in other areas?

A. They created a D-ring capture system for lifting the entire molds when they are assembled. Years ago they put those in.

*** 

Q. Okay. Now, so BATO had implemented the capture system, the encapsulated capture system for lifting the very heavy molds in their entirety, when they were all put together and it's 11,000 pounds?

A. Yes.

Concerning why the "D-ring capture" system was not implemented in Cumberland's shop prior to Decedent's accident, Mr. Shipley stated:

Q. Now, why was that ["D-ring capture" system] not implemented for mold repair?

A. I don't have a very good answer for that. . . .

In addition to the "D-ring capture" system, other safety measures were implemented in other shops, but not in the Cumberland shop. For example, in other areas of the Bridgestone plant, Bridgestone provided workers with "go/no go gauges" that could be used to determine if the threads that the bolts were inserted into had stretched. Decedent did not have this gauge in the Cumberland shop. As Mr. Holcomb explained:

Q. Okay. Was there based on your investigation, was there any policy or procedure in place to inspect the holes that would receive the bolts for lifting?

A. My understanding is, when I asked them and that was the no/go-no gauge that you asked about earlier—if they used the go/no-go gauges to determine if there was any stretch to the threads, and they said no, they did not use those.

Q. So that was not available to Beau?

A. That was not.

Q. Do you know that other—I mean, obviously, these gauges are used elsewhere in the plant?

A. They are used in the mold shop.

Q. Okay. But not mold repair?

A. Not mold repair. They use those gauges, to my understanding—when they completely assemble a mold, the mold that Beau was working on when it's completely assembled weighs about 11,000 pounds.

Q. Okay.

A. And you put bolts in this way to lift, and so you have to have a strong

- 13 -

integrity of the threads. And so they use those [go/no go gauges] to . . . make sure that those threads are not worn, and that there's integrity of the threads to lift.

\*\*\*

Q. So . . . just hypothetically, if Beau had a go/no-go gauge . . . that morning, and he used it before he inserted the bolts and he found that there was something wrong with the insertion hole to where the bolt wouldn't go in all the way, that could have led to re-tapping the—or fixing the female part of the threads?
A. That is correct.
Q. Okay. So that could have been—can we safely characterize that as a gap in his process?
[A.] Yes.
Q. Had he had a go/no-go gauge, that could have prevented the accident?
A. Possibly.

\*\*\*

Q. Should there have been regular inspections of the female portion of the threads to determine whether or not those should have been re-tapped or otherwise repaired?
[A.] I believe they should have.

From the foregoing testimony, lifting and turning molds was part of Bridgestone's operations in several areas of its plant. The foregoing testimony also indicates that Bridgestone set the safety procedures used in its plant. These safety features clearly extended to the mechanism for lifting and turning tire molds. As such, the fact that Bridgestone implemented safety requirements, *i.e.,* the "D-ring capture" system and use of the "go/no go gauge," for lifting and turning molds in other shops within its facility, but did not do so in Cumberland's shop, creates a dispute of fact as to whether Bridgestone undertook a duty to inspect the Cumberland repair shop and, if so, whether it breached that duty.

Finally, as to foreseeability, Bridgestone contends that Decedent's accident was not foreseeable insofar as no similar incidents had occurred at its plant up to the date of Decedent's accident. Mr. Holcomb's testimony belies this contention and creates a dispute of fact on the question, to-wit:

Q. Okay. Are you aware of BATO having an incident many, many years ago where an eyebolt broke or failed?
A. Yes.

- 14 -

Q. And that is what caused BATO to implement the closed capture system for lifting on the larger plates?
A. Yes.
Q. Okay. So that's not something that I mean, it happened before, so BATO was aware of this?
A. Yes.
Q. And having a similar failure in the past, that would mean that this accident with Mr. Lowe would not have been unforeseeable . . . . Agreed?
A. I can't answer that. I don't know if it is or not.

The Tennessee Supreme Court has explained:

In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable, and, if so, must then apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable. *Satterfield*[,] 266 S.W.3d [at] 366. That is, in consideration of, among other things, the presence or absence of prior similar incidents, and other circumstances, does the foreseeability of the harm outweigh the burden of the duty imposed? *McClung* [*v. Delta Square General Partnership*], 937 S.W.2d [891,] at 901[(Tenn. 1996)]. In *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008), we held as follows:

> The foreseeability of the harm is a key factor in the equationn because, in general terms, "[f]oreseeability is the test of negligence." *West* [*v. East Tennessee Pioneer Oil Co.*], 172 S.W.3d [545,] at 552 [(Tenn. 2005)] (quoting [*Doe v.*] *Linder Constr. Co.*, 845 S.W.2d [173,] at 178 [(Tenn. 1992)]; *Hale v. Ostrow*, 166 S.W.3d 713, 716-17 (Tenn. 2005). "'A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.'" *West*, 172 S.W.3d at 551 (quoting *Linder Constr. Co.*, 845 S.W.2d at 178). However, foreseeability alone does not create a duty to exercise reasonable care. *McClung*, 937 S.W.2d at 904. If the risk Is foreseeable, then courts should weigh the remaining factors to determine if an imposition of duty is justified.

Although no duty will arise when a risk of injury is not generally foreseeable, foreseeability alone "is not, in and of itself, sufficient to create a duty." *Satterfield*, 266 S.W.3d at 366. Rather, when a minimum threshold of foreseeability is established, courts must engage in "an analysis of the

relevant public policy considerations," *id.* at 364-65, to determine whether a duty enforceable in tort must be imposed. While not exclusive, the factors are as follows:

> [T]he foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

> *McCall*, 913 S.W.2d at 153. *See also* *Burroughs* [*v. McGee*], 118 S.W.3d [323,] at 329 [(Tenn. 2003)].

> When and if the trial court determines that the foreseeability of the harm and its particular gravity outweigh the burden of taking reasonable protective measures, the question "of duty and of whether defendants have breached that duty . . . is one for the jury to determine based upon proof presented at trial." *McClung*, 937 S.W.2d at 904. As previously stated, whether a defendant owed a duty of care is a question of law for the court to decide. *West*, 172 S.W.3d at 550; *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000). Nevertheless, courts should take precautions to avoid any invasion of the province of the jury. *Satterfield*, 266 S.W.3d at 367-68.

*Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 365-66 (Tenn. 2009); *see also* *Richardson v. Trenton Special School District*, No. W2015-01608-COA-R3-CV, 2016 WL 3595563, at *4-5 (Tenn. Ct. App. June 27, 2016).

Mr. Holcomb's testimony creates a dispute of fact as to whether Decedent's accident was foreseeable. As such, the questions "of duty and of whether [Bridgestone] ha[s] breached that duty . . . [are] . . . for the jury to determine based upon proof presented at trial." *Giggers*, 277 S.W.3d at 366 (quoting *McClung*, 937 S.W.2d at 904). As the Tennessee Supreme Court has cautioned:

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment

- 16 -

proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

***EVCO Corp. v. Ross***, 528 S.W.2d 20, 24-25 (Tenn. 1975). Based on the foregoing discussion, there are disputes of material fact that preclude the grant of summary judgment on the question of duty.

## V. Workers' Compensation Exclusivity

As noted above, the trial court denied Bridgestone's motion for summary judgment on the question of workers' compensation exclusivity. Bridgestone contends that this was error. Specifically, as set out in its brief, Bridgestone argues:

> BATO contracted with Cumberland to perform repair and maintenance work on BATO's tire molds. While BATO was not Mr. Lowe's direct employer, BATO was his "statutory employer" under the workers' compensation law. Accordingly, BATO is immune from suit and is entitled to summary judgment on its exclusive remedy defense. If the Court reaches this issue, it should reverse the trial court's denial of BATO's motion for summary judgment on this defense and affirm the judgment below entered in BATO's favor.
>
> BATO was Mr. Lowe's statutory employer for three independent reasons. First, the work that Mr. Lowe performed was a part of BATO's "regular business." Second, the work that he was performing at the time of the accident was the same type of work that is also usually performed by BATO's employees. Third, if Plaintiffs' allegations against BATO are accepted as true, then BATO had the right to control the conduct of Mr. Lowe's work. Based upon each of these conditions, the Court should find that BATO was Mr. Lowe's statutory employer.

"'Under the Tennessee Workers' Compensation Act, an employee injured in an accident while in the course and scope of employment is generally limited to recovering workers' compensation benefits from the *employer*.'" ***Fayette Janitorial Services v. Kellogg USA***, No. W2011-01759-COA-R3-CV, 2013 WL 428647, at \*3 (Tenn. Ct. App. Feb. 4, 2013) (quoting ***Murray v. Goodyear Tire & Rubber Co.***, 46 S.W. 3d 171, 175 (Tenn. 2001)) (emphasis added). "However, for injuries sustained by employees of subcontractors, our legislature has extended workers' compensation liability to principal contractors under certain circumstances." ***Id***. Indeed, Tennessee Code Annotated section 50-6-113(a) provides:

> A principal contractor, intermediate contractor or subcontractor shall be liable for compensation to any employee injured while in the employ of any of the subcontractors of the principal contractor, intermediate contractor or

subcontractor and engaged upon the subject matter of the contract to the same extent as the immediate employer.

Tenn. Code Ann. § 50-6-113(a). This Court has explained that

> [t]he extension of workers' compensation liability to principal contractors under section 50-6-113 applies "regardless of whether [the principal contractor's] subcontractors are independent contractors." *Murray*, 46 S.W.3d at 175; *see also* **Hendrix v. Ray-Ser Dyeing Co.**, 224 Tenn. 690, 694, 462 S.W.2d 483, 484 (Tenn. 1970); **Harness v. Bechtel Jacobs Co., LLC**, No. E2006-00194-COA-R3-CV, 2007 WL 10447, at *3 (Tenn. Ct. App. Jan. 3, 2007). A principal contractor "may be held liable for injuries sustained by employees of his subcontractors, even when those subcontractors are deemed to be independent contractors." *CNA (Continental Cas.)* [*v. King*, No. M2004-02911-COA-R3-CV,] 2006 WL 2792159, at *4 [(Tenn. Ct. App. Sept. 28, 2006)]. The statute clearly expands the responsibility for workers' compensation benefits "beyond the traditional employer-employee relationship." **Stratton v. United Inter-Mountain Telephone Co.**, 695 S.W.2d 947, 950 (Tenn. 1985). It "essentially creates "statutory employers" when injured workers are otherwise unable to recover workers' compensation benefits from their immediate employers." **Bostic v. Dalton**, 158 S.W.3d 347, 350 (Tenn. 2005) (citing *Murray*, 46 S.W.3d at 175).
>
> The statutory employer rule set forth in section 50-6-113 "is intended to ensure that all workers will receive compensation when they are injured in the course of their employment." **Lindsey v. Trinity Commc'ns, Inc**. 275 S.W.3d 411, 420 (Tenn. 2009) (citing *Stratton*, 695 S.W.2d at 951). By extending liability from the employer that does not have workers' compensation insurance to an intermediate or principal contractor that does have coverage, the statute "'prevents employers from contracting out normal work simply to avoid liability for workers' compensation.'" *Id*. (quoting *Stratton*, 695 S.W.2d at 951).

***

In exchange for the principal contractor's exposure to liability under the Workers' Compensation Law, the principal contractor receives immunity from suit in tort. **Troup v. Fischer Steel Corp.**, 236 S.W.3d 143, 148 (Tenn. 2007); **Campbell v. Dick Broadcasting Co., Inc. of Tennessee**, 883 S.W.2d 604, 606 (Tenn. 1994). Tennessee's Workers' Compensation Law contains an exclusive remedy provision which provides that "[t]he rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident . . . shall exclude all other rights and remedies of the employee . . . at common law or otherwise, on account of the injury or death."

- 18 -

Tenn. Code Ann. § 50-6-108. As such, "statutory employers may use the exclusive remedy provisions of Tenn. Code Ann. § 50-6-108(a) [ ] to defeat negligence actions brought against them by the same employees for whom they would have been required to provide workers' compensation coverage." *Williams* [*v. Premapak Corp.*, No. 01-A-01-9307-CV-00326, 1995 WL 50068, at *2 (Tenn. Ct. App. Feb. 8, 1995)] (citing *Campbell*, 883 S.W.2d at 606).

\*\*\*

In Tennessee, a court will find that a company is a principal contractor or statutory employer within the meaning of Tennessee Code Annotated section 50-6-113 only if it satisfies one of three tests. *Griffith v. Jellico Community Hosp., Inc.*, No. E2009-01431-COA-R3-CV, 2010 WL 2160775, at *3 (Tenn. Ct. App. May 28, 2010). As stated by our Supreme Court,

> Generally, a company is considered a principal contractor if:
> (1) the company undertakes work for an entity other than itself;
> (2) the company retains the right of control over the conduct of the work and the subcontractor's employees; or (3) "the work being performed by a subcontractor's employees is part of the regular business of the company or is the same type of work usually performed by the company's employees."

*Lindsey*, 275 S.W.3d at 421 (quoting *Murray*, 46 S.W.3d at 176).

*Fayette Janitorial*, 2013 WL 428647, at *3-5. As set out in its June 2, 2023 order denying summary judgment on Bridgestone's workers' compensation exclusivity theory, the trial court reasoned that there were disputes of fact as to "whether BATO had the right to control any of the work conducted by the [Decedent]," and whether "the work done by Cumberland was a regular part of BATO's business." As we noted above, these factual disputes have not been resolved. Specifically, we conclude that there are disputes of fact concerning Bridgestone's control of Cumberland's shop. There is also dispute as to whether Decedent's work was "part of the regular business of [Bridgestone] or is the same type of work usually performed by the [Bridgestone's] employees." In view of these disputes of fact, the trial court correctly denied Bridgestone's motion for summary judgment on the workers' compensation exclusivity question.

## VI. Conclusion

For the foregoing reasons, the trial court's order denying summary judgment on the question of workers' compensation exclusivity is affirmed. The trial court's order granting summary judgment on the question of duty is reversed, and the case is remanded for such

- 19 -

further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellee, Bridgestone Americas Tire Operations, LLC. Execution for costs may issue if necessary.

_____s/ Kenny Armstrong_____
KENNY ARMSTRONG, JUDGE
